UNITED STATES of America

v.

**Charles T. PASCIUTI, et al.**

**Crim. No. CR–91–63–01–22–S.**

United States District Court,
D. New Hampshire.

Aug. 24, 1992.

See also, 803 F.Supp. 563, 803 F.Supp. 568.

Asst. U.S. Attys. David Vicinanzo and Clyde R.W. Garrigan, Jeffrey R. Howard, U.S. Atty., Concord, N.H., for U.S.

Alan P. Caplan, San Francisco, Cal., for C. Pasciuti.

Paul J. Garrity, Londonderry, N.H., for R.S. Dodge.

## MEMORANDUM ORDER

FUSTE, District Judge, Sitting by Designation.

This case is a multi-count criminal prosecution against sixteen remaining defendants, for a continuing criminal enterprise and drug conspiracy. Several firearms violations are also charged. The indictment mentions that defendants, some of which allegedly belong to the Hell's Angels Motorcycle Club, influenced other motorcycle groups and together distributed large quantities of methamphetamine, marijuana, tetrahydrocannabinol (THC), and mescaline, Schedule I or II controlled substances, in New Hampshire and other places. The government claims that the drug business generated substantial profits laundered through legitimate businesses and that drugs were supplied as a reward to loyal conspirators and denied to those failing to perform as expected. The indictment mentions the use of threats, intimidation, beatings, and other forms of violence in defense of and to protect the drug business, the thwarting of investigative efforts by law enforcement, the threatening of witnesses and jurors, and the possession of weapons to accomplish the above.

On June 17, 1992, we granted the government's motion requesting an anonymous jury. *See* Order dated June 17, 1992, Docket Document No. 560, and Order, *United States v. John Courtois*, CR–91–63–04–S, dated July 13, 1992, Docket Document No. 675. In these orders, we left both the bases for our ruling and the specifics of its implementation for a future occasion. The ruling was announced in early June 1992 so that the parties would know as soon as possible of the court's intention to proceed with an anonymous jury. Defendant Charles Pasciuti filed a motion for reconsideration of the court's order on July 30, 1992. *See* Docket Document No. 740. We *deny* defendant's motion for reconsideration and now *expand* on the reasons behind our order granting the government's motion for an anonymous jury.

Although the First Circuit has not had occasion to rule on the standards a trial court should apply in determining whether to empanel an anonymous jury,[1] the Second and Third Circuits have reviewed numerous district court decisions with respect to this issue. *See United States v. Paccione,* 949 F.2d 1183, 1191–93 (2d Cir.1991) (and cases cited therein); *United States v. Scarfo,* 850 F.2d 1015, 1021–26 (3d Cir.), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988). In *Paccione,* the court opined:

> In general, the court should not order the empaneling of an anonymous jury without (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.

949 F.2d at 1192 (citations omitted). *See also United States v. Edmond,* 730 F.Supp. 1144, 1145 (D.D.C.1990) (a balance must be maintained between "the interests of the criminal justice system—protecting the jurors and their families from violence, actual or threatened, and shielding the jurors from the potential taint of extensive trial-related publicity—and.... the defendants' interests—conducting a meaningful *voir dire* to permit the intelligent exercise of their peremptory challenges and retaining their presumption of innocence"). The court in *Paccione* went on to review Second Circuit case law and summarized the various combinations of factors found to provide a sufficient basis for the empanelment of an anonymous jury.

Sufficient reason for empaneling an anonymous jury has been found to exist where, for example, the defendants "were alleged to be very dangerous individuals engaged in large-scale organized crime who had participated in several 'mob-style' killings," and there was "strong evidence of defendants' past attempts to interfere with the judicial process, and defendants were alleged to be part of a group that possessed the means to harm jurors," *United States v. Thomas,* 757 F.2d 1359, 1364–65 (2d Cir.), *cert. denied,* 474 U.S. 819 [106 S.Ct. 66, 88 L.Ed.2d 54] (1985); or where the defendants have been charged with grand jury tampering and the trial is expected to attract publicity, *United States v. Vario,* 943 F.2d 236, 240 (2d Cir.1991), *cert. denied,* [—— U.S. ——] 112 S.Ct. 882 [116 L.Ed.2d 786] (1992); *United States v. Persico,* 832 F.2d 705, 717 (2d Cir.1987) (warranted by history of violence and willingness to corrupt and obstruct justice, together with expectation of extensive publicity), *cert. denied,* 486 U.S. 1022 [108 S.Ct. 1995, 100 L.Ed.2d 227] (1988); or where the defendant has a history of attempted jury tampering and a serious criminal record, *United States v. Tutino,* 883 F.2d 1125, 1132–33 (2d Cir.1989), *cert. denied,* 493 U.S. 1081 [110 S.Ct. 1139, 107 L.Ed.2d 1044] (1990); or where there had been extensive pretrial publicity and there were abundant allegations of dangerous and unscrupulous conduct, *United States v. Barnes,* 604 F.2d 121, 141 (2d Cir.1979), *cert. de-*

---

**1.** The Court of Appeals for the First Circuit did tangentially touch on this issue in the case of *In re Globe Newspaper Co.,* 920 F.2d 88 (1st Cir. 1990). In *Globe Newspaper,* the appellate court directed the district court to turn over to a newspaper a list of names and addresses of jurors who participated in a criminal trial. The court did cite the case of *United States v. Scarfo,* 850 F.2d 1015, 1023 (3d Cir.), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988), and did discuss the fact that "jurors summoned from the community to serve as participants in our democratic system of justice are entitled to safety, privacy and protection against harassment." 920 F.2d at 95. However, the finding of the court in *Globe Newspaper*—that juror names

may only be withheld in the District of Massachusetts upon a specific finding by the court that the interests of justice so require, *see Id.* at 92–93—resulted from a challenge to a *post-trial* request for the information. The court itself recognized that the pre-trial withholding of names and addresses raised a different set of issues than that before it. *Id.* at 93. For a general discussion on the subject of "anonymous justice," *see* Marc O. Litt, Article, *"Citizen-Soldiers" or Anonymous Justice: Reconciling the Sixth Amendment Right of the Accused, the First Amendment Right of the Media and the Privacy Right of Jurors,* 25 Colum.J.L. & Soc.Probs. 371 (1992).

*nied,* 446. U.S. 907 [100 S.Ct. 1833, 64 L.Ed.2d 260] (1980).

*Paccione,* 949 F.2d at 1192. *See also Scarfo,* 850 F.2d at 1021–26 (defendant's link to organized crime coupled with threats to government witnesses and past actions, including murders and attempted bribery of judges and prospective witnesses, provide a sufficient basis to empanel anonymous jury).

The government proffers various reasons for the necessity of empaneling an anonymous jury. (Docket Document No. 424). First, the government argues that all of the defendants are present, former or prospective members of or closely associated with the Hell's Angels Motorcycle Club ("HAMC"), an organization with a reputation for violence and organized criminal activity. Also, according to the prosecution, HAMC members have a long history of intimidating witnesses, intimidating jurors, and interfering with the judicial process and have, in fact, attempted to intimidate and threaten with violence government witnesses in the present case. Also, the government argues that, as this case has generated a significant amount of pretrial publicity, it is likely that there will be substantial media coverage during the trial, heightening the possibility that juror identities will be publicized, potentially exposing them to interference and harassment by criminal elements or by the public.[2]  Finally, the prosecution suggests that defendants' right to a fair trial will also be protected through the use of an anonymous jury in that those individuals or groups in conflict with HAMC may seek to encourage a guilty verdict through juror harassment or intimidation.

The government also filed an affidavit and exhibits in support of its motion for an anonymous jury. Assistant United States Attorney ("AUSA") Clyde R.W. Garrigan's affidavit describes reports of attempted interference with the judicial process in the present case. In addition, appended to AUSA Garrigan's affidavit were motions and affidavits of various prior criminal prosecutions involving HAMC members, which detail various attempts to interfere with the judicial process.[3]  The details can be verified by reading AUSA Garrigan's Affidavit, forming part of Docket Document No. 424.[3a]

While defendant Pasciuti filed no timely opposition to the government's original motion for anonymous jury, he did file the present motion for reconsideration of the court's order granting the motion.[4]  Counsel for Pasciuti also filed a Declaration in Support of Defendant's Motion, in which he challenges some of the factual allegations of the government's affidavits and exhibits.

---

**2.** Today we have entered an order denying codefendant Charles Pasciuti's motion to continue the trial and for prosecutorial disqualification. There, we treated the subject of pretrial publicity. We have found that up to this moment, pretrial publicity has not affected the defendants' right to a fair trial by jury.

**3.** Furthermore, as part of sealed proceedings held by this court on August 5, 1992, the subject of threats to relatives or friends of persons thought of as becoming government witnesses came up. Less than an hour after the sealed proceedings concluded, court personnel received a telephone call from what appeared to be a person related to this case, inquiring about the identities of those who participated in the proceedings. The spectre of retaliation was evident. In addition, court security personnel spotted an individual taking photos of persons arriving at and departing from the courthouse on that occasion. Preliminary investigations point to a person with criminal record who poses as an investigator.

**3a.** *See Government's Affidavit in Support of Motion for Anonymous Jury and Motion to Impose Rules Governing Spectators at Trial,* appended hereto as *Exhibit I.*

**4.** The government's motion for an anonymous jury was filed on March 31, 1992, Docket Document No. 424. We granted the request on June 17, 1992, Docket Document No. 560. At this time, defendant had entered no opposition to the government's request. On June 17 and 18, 1992, we had informal status conferences with counsel for most defendants. On said occasion, counsel for Charles Pasciuti requested up to and including July 3, 1992 to file a motion for reconsideration on the issue of jury anonymity. The request was granted, but no timely filing took place. The motion for reconsideration, although filed twenty-seven days after the agreed deadline and almost four months after the filing of the government's first motion, has been considered by the court.

*See* "Declaration of Attorney Alan P. Caplan in Support of Defendant Charles Pasciuti's Motion to Reconsider the Granting of Prosecution's Motion for an Anonymous Jury," forming part of Docket Document No. 740.[4a] This document also merits a careful inspection. Defendant argues that, given the weak evidentiary basis of the government's case, the prosecution is seeking to create a "false atmosphere of fear and suspicion" with the result that the jurors will ignore the evidence and find defendants guilty based on inappropriate factors. Defendant also argues that the government has failed to meet its burden in coming forth with specific reasons why an anonymous jury should be empaneled.

Having again reviewed the parties' submissions, we reaffirm our holding that, given the circumstances of this case, the empaneling of an anonymous jury is in order.

First of all, the government's motion and affidavit detail attempts at interference or coercion of government witnesses in the present case. In addition, the facts support the government's contention that members of HAMC are prone to the use of intimidation and threats to obstruct the functioning of the judicial process.

Second, the government has also come forward with affidavits and filings from previous cases in which claims were made that HAMC members attempted to influence government witnesses, jurors, and other facets of the legal process. The supporting material confirms the known fact that the HAMC has historically demonstrated its willingness to corrupt and obstruct justice and that those associated with the organization are capable of doing so in the present case.

Third, we feel it would be an irresponsible act on our part not to take these measures. According to our independent assessment as the Article III judge assigned to this case, the potential for jury intimidation, violence, retaliation, or tampering is indeed present. During these times of major drug trafficking and other similar criminal conduct, federal judges are exposed to a variety of criminal cases where dangerousness, jury tampering, threats against witnesses, and even violence have occurred. *See United States v. Panzardi–Alvarez*, 678 F.Supp. 353 (D.P.R.1988), *aff'd* 879 F.2d 975 (1st Cir.1989). We have been exposed to these problems and to the solutions crafted by other courts in dealing with such situations. Anonymous juries and at times jury sequestration are tools available to minimize the impact that certain unique criminal cases have on jurors, witnesses, and parties.

Anonymity of a jury panel in a criminal case also protects the integrity of the fact-finding process when one expects considerable trial publicity and newspaper, radio, and television coverage after the trial begins. The media and the public may be curious concerning the identity of the participants, the witnesses, the lawyers, and the jurors. If such information falls in the wrong hands, this may result in jury interference, to say the least.

If an incident affecting jury integrity occurs, the presiding judge may not get to know of the details until it is too late to take corrective measures. When jurors are exposed to prying into their personal affairs, with the potential of intimidation, it is only logical to expect that the incident will distort and distract the quality of attention needed for a trier of fact to function properly. Under the circumstances, the Article III judge is afforded U.S. Marshal protection to deal with the adverse pressures and the risks involved. It is only logical to assume that a juror will also be affected by the potential of intimidation in any of its forms. The effect on a juror, without a doubt, is more severe than on the Article III judge, who deals with these problems on a frequent basis. We think that this

---

**4a.** *See Declaration of Attorney Alan P. Caplan in Support of Defendant Charles Pasciuti's Motion to Reconsider the Granting of Prosecution's Mo-* *tion for an Anonymous Jury,* appended hereto as *Exhibit II.*

case is one of those unique cases where the potential damage of interference with jury service merits preventive action.

Defense counsel seem to believe that the government's motion and affidavits in support of its request for anonymous jury, filed March 31, 1992, Docket Document No. 424, represent exaggeration and fact distortion. We disagree. We considered the contents of the motion, the affidavits in support, and the oppositions filed by the parties. We have also carried out an independent day-to-day analysis of the mentioned risks from day one of our present assignment. We have also considered the U.S. Marshals Service's independent assessment and opinion. This judge has discussed some aspects of this case with the judge to whom the same was originally assigned. Considering the type of case, the number of defendants, the nature of the indictment, and the information on file, we would have been inclined to order jury anonymity *motu proprio*. With what this judge knows about this case, it is only prudent to make certain that the trial flows smoothly and that the fact-finding process is not affected in any form or fashion. Precautions will be taken to minimize any prejudicial effects on the defendants and to make certain that their fundamental rights are protected.[5]

The Clerk will notify the contents of this order to all attorneys of record. Those defendants who adopted codefendant Charles Pasciuti's motion shall be bound by this ruling. This order will remain *sealed* until the jury selection is completed and the jury preliminary instructions have been given. Copies made available to counsel of record will be kept confidential while the order remains sealed. Any violation of this specific disposition will be severely sanctioned.

IT IS SO ORDERED.

5. The court intends to borrow from Judge Pollack's cautionary instruction, adopted by the Honorable T. Emmet Clarie, Senior District Judge, U.S. District Court, District of Connecticut, on September 1, 1988, in the case of *U.S. v.*

EXHIBIT I

In the United States District Court

for the District of New Hampshire

United States of America

v.

Charles T. Pasciuti a/k/a Doc, et al.

Cr. 91-63-01-13-S

GOVERNMENT'S AFFIDAVIT IN SUPPORT OF MOTION FOR ANONYMOUS JURY AND MOTION TO IMPOSE RULES GOVERNING SPECTATORS AT TRIAL

CLYDE R.W. GARRIGAN, being duly sworn, deposes and says:

I am an Assistant United States Attorney for the District of New Hampshire. I respectfully submit this Affidavit in Support of the Government's Motion for an Anonymous Jury and Motion to Impose Rules Governing Spectators at Trial. Upon information and belief, the material contained herein is true and correct and is based upon conversations with and documentation provided by law enforcement officers and other credible sources as noted.

A. *Interference With the Judicial Process in the Present Case*

1. BATF Special Agent Thomas Crowley provided the following information regarding government witness *Gaylen Blake:*

On June 15, 1990, Gaylen Blake, former President of the Crazy Eights Motorcycle Club (CEMC) and his wife, Janet, were residing in a town in the southern section of the United States. They were both served with subpoenas to testify before the federal grand jury sitting in Concord, New Hampshire on June 21, 1990 regarding their knowledge of the Hells Angels Motorcycle Club (HAMC) Lowell Chapter, and the CEMC, and those organizations' con-

*Victor M. Gerena, et al.,* Cr. No. H-8550, involving a $7+ Million Wells Fargo robbery by a radical organization. *U.S. v. Thomas,* 757 F.2d 1359, 1365 n. 1 (2d Cir.1985).

nections to and involvement in methamphetamine trafficking.

On June 16, 1990, Glen Blake, who is Gaylen Blake's twin brother and who resided in the same town, was approached by two white males claiming to be FBI agents and who were looking for Gaylen Blake. The two men refused to show Glen Blake any credentials. Glen Blake refused to talk to them because of their manner and approach and told them to leave.

The FBI has had no role in the investigation of the present case, although it has been involved in the investigation of the criminal activity of other Hells Angels members in other parts of the country.

On June 20, 1990, Gaylen and Janet Blake and their young child arrived in Concord, New Hampshire to answer the subpoenas. After meeting with investigators, Gaylen Blake agreed to cooperate in the investigation and testify regarding his knowledge of methamphetamine distribution by Charles "Doc" Pasciuti and others. The Blake family did not return home and were relocated and protected by federal agents. They subsequently entered the U.S. Marshals Service Witness Protection Program. Blake, who had already been severely beaten by members of the HAMC and CEMC, was extremely concerned for his safety once it became known that he was cooperating and his whereabouts determined.

On June 27, 1990, Glen Blake contacted a federal agent in Concord, New Hampshire and related that the Blake's home had been broken into some time during the previous twenty-four hours. Nothing appeared to have been taken. However, notes by the Blakes referring to their grand jury appearance in Concord were in plain view.

On July 13, 1990, two white males, described as "biker" types, approached Gaylen Blake's father at his home in southeastern Massachusetts. One of the men asked the senior Mr. Blake where his son Gaylen was. Mr. Blake told the men that he would call the police if the men did not leave. One of the men replied, "What are you, a wise guy? You want a slap in the head?" The two men then left.

On the following day, July 14, 1990, Glen Blake reported that he was driving his vehicle in his hometown and was stopped at a stop sign when a brown van pulled up next to him. The van's passenger jumped out of the van and reached into Blake's vehicle. The passenger grabbed Blake by the neck and said, "Let's go look for your brother." Glen Blake had a firearm under the seat of his car which he grabbed and pointed at his assailant. The assailant jumped back and said, "You and your brother are both dead motherfuckers." Blake then noticed the butt of a revolver in his assailant's waistband. The man reentered the van and Blake backed his car away and fled. Glen Blake was able to observe a round white sticker on the passenger's vent window which said, "Bad Co. Lowell." (This is a well known nickname for the Lowell Chapter of the Hells Angels. These stickers identify the possessor as an associate or supporter of the HAMC). The van had a license plate which he believed had a green background and white letters. Glen Blake described his assailant as a tall, heavy, white male with tattoos on his arms, and a northeastern accent.

On July 15, 1990, Glen Blake reported that he arrived home at 10:00 p.m. He heard a noise coming from his garage and observed someone running from the rear.

On September 4, 1991, Gaylen Blake told S/A Crowley that two members of the CEMC had recently been to visit Blake's father and mother looking for Gaylen.

2. BATF S/A Crowley provided the following information regarding government witness *Robin Golden:*

In May 1990, Robin Golden, a former associate of "Doc" Pasciuti and the Lowell HAMC, agreed to cooperate with federal investigators. At the time she began cooperating, she was in extreme fear that she would be harmed by the HAMC as a result of her personal knowledge of criminal activity. She subsequently entered the Witness Protection Program.

In May 1990, a federal search warrant was executed at defendant Charles Pasciu-

ti's home in Westford, Massachusetts, which resulted in the seizure of a firearm and other evidence. The search warrant was based, in part, on information provided by Robin Golden.

On July 2, 1990, a relative of Robin Golden's told investigators that on June 22, 1990 another relative had found a typewritten note on the front porch of their home in the southwestern section of the United States. The note read something to the effect, "We know that you know something and we will find out." The relative who discovered the note destroyed it and did not notify the police out of fear.

On June 13, 1990, a former truck driving partner of Robin Golden's told an ATF agent that he had recently been parked in a rest area in Missouri to sleep. When he awoke, he found that his truck had been entered by someone who removed a small observation window on the lower part of the passenger side cab door. A pair of western boots had been left in the truck which were not his. Inside one of the boots was a note which said something to the effect, "This is what the future holds in store for you and your lady." The witness believed this referred to Robin Golden.

3. S/A Thomas Crowley provided the following information regarding government witnesses *David Machado* and *Larry Machado:*

Both David and Larry Machado (who are unrelated) were formerly associated with the CEMC and defendants in the present case. On January 22, 1992, they both met with federal prosecutors and investigators. Later that day, both men testified before the federal grand jury and returned home. The following morning, January 23, 1992, Larry Machado discovered a message on his answering machine. The male voice stated they knew Machado was cooperating and that he would likely be harmed if he cooperated. (S/A Crowley advised the affiant that the statement was to the effect, "We know you're the rat and you're going to pay.")

Both David and Larry Machado are now federally protected witnesses.

4. BATF Resident Agent in Charge (RAC) Louis Tomasello provided the following information regarding government witness *Gordon Tardiff:*

Gordon Tardiff is a former member and president of the Die Hards Motorcycle Club. Tardiff received methamphetamine from defendant Charles "Doc" Pasciuti and other defendants and distributed it in the Lakes Region of New Hampshire. In the fall of 1991, Tardiff agreed to cooperate with federal investigators.

On or about February 4, 1992, Tardiff advised RAC Tomasello that he had met with two old acquaintances from the motorcycle world. Those individuals told Tardiff that they had heard that Tardiff was cooperating with the police and that the Hells Angels were going to get him. Tardiff believed he would be harmed if the HAMC learned of his cooperation.

Mr. Tardiff is presently a federally protected witness.

5. BATF S/A Terrence Barry testified at defendants Charles "Doc" Pasciuti and Charles "Chuckie" Casella's detention hearing before Judge Magistrate William H. Barry, Jr. on October 15, 1991. Barry testified that following "Doc" Pasciuti's conviction in Massachusetts for the brutal beating of Joseph Myrozek in March 1980, Barry met with "Doc" Pasciuti in prison. Pasciuti told S/A Barry that "the only mistake he [Pasciuti] made was not finishing Mrozek (sp) off." Barry understood Pasciuti to mean he should have killed Myrozek. (Hearing Tr. p. 24).

6. BATF S/A Joseph K. Granatino testified at a detention hearing before Judge Stahl in *United States v. John Pasciuti* (Cr. 91–63–07–S) on January 14, 1992. That testimony was transcribed.

Granatino indicated that defendant John Pasciuti, a prospective member of the HAMC and brother of HAMC Lowell Chapter President Charles "Doc" Pasciuti, was arrested by the Massachusetts State Police on October 29, 1991 after a loaded .22 caliber revolver was found in the truck in which John Pasciuti was a passenger. The driver was HAMC member Michael Gardner, and the truck belonged to HAMC pro-

spective member Ken Anderson. The truck was southbound on Rte. 128 in Lexington, Massachusetts at the time it was stopped by the Trooper. Pasciuti was also charged with possessing a hypodermic needle and syringe found in his vicinity after he had been ordered to exit the vehicle. John Pasciuti was free on conditions of release in the present case at the time of his arrest on this incident. (He was indicted by the Middlesex County (Massachusetts) Grand Jury in January 1992).

### B. Courtroom Displays and Other Conduct in the Present Case

1. The affiant has personally observed color wearing members and prospects of the HAMC attending nearly all the public hearings to date in the present case. I have observed HAMC members and prospects loitering in the hallway before and after hearings in the present case, conspicuously displaying HAMC insignias. On February 12, 1992, during a hearing on the Government's conflict of interest motion before Judge Stahl in Courtroom 2, defendants George Caruso and David Beaton appeared and testified while wearing full HAMC "colors."

2. I was advised by U.S. Marshals CSO Ed Hubbard that at a bail revocation hearing for defendant John "C.J." Courtois held on December 12, 1991 in Courtroom 2, he approached an individual believed to be Ronald Alward. (Alward, a prospect for the Lowell Chapter of the HAMC, has attended many of public court proceedings in this case). The CSO asked Alward to move to other seats in the spectator section. Hubbard heard Alward say to another HAMC associate that, "They're going to have to have an auditorium when this thing goes to trial."

3. Trooper Terrence Kinneen of the New Hampshire State Police Intelligence Unit has received information that t-shirts are being distributed emblazoned with "Free Doc" and "Free Chuck," as well as HAMC and Lowell Chapter insignias and symbols. These shirts refer to defendants and HAMC members Charles "Doc" Pasciuti and Charles "Chuckie" Casella. In addition, other memorabilia is allegedly being sold to rally support for the HAMC and the members and associates under indictment in the present case.

4. Trooper Kinneen has received information that the HAMC (and in particular the Massachusetts chapters) are "at war" with the Devils Disciples Motorcycle Club (DDMC). Two HAMC members were stabbed in Revere on November 8, 1991, allegedly by DDMC members.

The conflict between the HAMC and DDMC is longstanding and allegedly has its roots in the murder of an HAMC member in New Hampshire after the Laconia/Loudon "Motorcycle Weekend" of 1972. (See State v. Dayutis, 127 N.H. 101, 498 A.2d 325 (1985)).

In addition, the HAMC has been in conflict with the Outlaws Motorcycle Club (another international motorcycle gang) since the mid–1970's when HAMC Lowell Chapter members were allegedly murdered by Outlaws in Florida. That "war" has since resulted in multiple murders and other acts of violence.[1]

5. On August 7, 1991, Trooper Kinneen participated in a telephone interview of William Medeiros a/k/a "Wild Bill." Medeiros is a former member of the HAMC and was security officer for the New York City Chapter. After "Operation Rough Rider" resulted in the indictment of him and many other Hells Angels members on drug and racketeering charges in May 1985, Medeiros was a fugitive from justice until October 1985. He subsequently agreed to cooperate with the government and entered the Witness Protection Program. Medeiros said he had known "Doc" Pasciuti for many years. He said that the HAMC will make a concerted effort to identify all potential government witnesses. The Lowell Chapter is "notorious" for going after witnesses. The HAMC circulate copies of all police reports, particularly those containing witness statements, to every HAMC chapter. If an HAMC member cooperates, the club will circulate photos of the individual

---

1. For example, see facts in *United States v. Bar-*    *ger,* 931 F.2d 359 (6th Cir.1991).

as a "wanted" poster among all HAMC chapters *and* other outlaw motorcycle associated with the HAMC. The security officer in each HAMC chapter maintains security files on each member, including photographs and information about the member's family as insurance that members will not cooperate with police. If a member cooperates, he is put in the "hit file" and will be killed if located.

Medeiros believes that the HAMC is still searching for him and is certain he would be killed if found because of the assistance he has provided to law enforcement and because he testified against the HAMC.

6. I have reviewed a report by Westford (Massachusetts) Police Department Patrolman Hervey P. Cote. That report indicates that he spoke with Charles "Doc" Pasciuti on September 1, 1990. During that interview, Pasciuti confirmed that he was an officer of the East Coast chapters (including numerous Canadian chapters in Quebec) of the HAMC. When asked by Cote if he was considered an important member of the club, Pasciuti stated that some people in the HAMC call him the "East Coast Sonny Barger." During that interview, "Doc" Pasciuti confirmed that the HAMC was at war with the Outlaws Motorcycle Club, and that it began when two members of the Lowell Chapter were killed in Florida.

## C. Interference With the Judicial Process in Other Cases Involving Members or Associates of the HAMC

1. In 1987, in the cases of *United States of America v. Paul Francis Casey a/k/a "K.C." and Brendan Manning*, SSS 85 Cr. 428 (PNL) (S.D.N.Y.), the FBI case agent and prosecuting AUSA filed Affidavits in support of the Government's Motion to Empanel an Anonymous Jury with Appropriate Safeguards. Both defendants were members of the HAMC. Those affi-

davits (appended hereto at A and incorporated herein) described specific alleged acts of violence and intimidation by the HAMC intended to interfere with the judicial process, including the murder of a witness and her two small children [2] and the attempted murder of law enforcement officers.

1(a) Detective Nicholas Barone of the Connecticut State Police (who testified for the Government at Pasciuti/Casella's detention hearing as an expert witness on the HAMC) provided information that in 1986, following the investigation and prosecution of a large number of East Coast HAMC members in the mid–1980's (Operation Rough Rider) that he received reliable information that he and Chief Assistant United States Attorney for the District of Connecticut, H. James Pickerstein, were to be physically harmed by the HAMC. These attempts at violence were to be funded by the HAMC Oakland, California Chapter. As a result, Barone was subject to intense round-the-clock security for an extended period of time. (*See* also Transcript, Detention Hearing, *United States v. Charles Pasciuti/Charles Casella*, 10/15/91, p. 121–122).

2. In 1990, in the case of *United States v. Timothy Jay Blackwell, et al.* (United States District Court for the Middle District of North Carolina, Cr. 90–128–01–05 WS), the Government filed a motion for a list of unnamed, numbered jurors. The motion was supported by the affidavit of former HAMC member Charles Terry Norman (a/k/a "Fat Terry"), who began cooperating with the United States in late 1989. The affidavit is appended hereto at B. Norman alleged that HAMC national officers had ordered members to attend the trial of HAMC Oakland Chapter President Ralph "Sonny" Barger, wear colors to court, and congregate in and around the courthouse.

3. In *United States v. Dennis George, et al.* (United States District Court for the

---

2. The affiant contacted the Washington County (Oregon) District Attorney's Office on March 3, 1992. I was advised on March 9, 1992 that Otis "Buck" Garrett, a member of the HAMC "Nomad" Chapter and HAMC associate Robert McClure were indicted in March 1991 (case

numbers C910372CR and C9103723CR) for the brutal murders of witness Margo Compton and her twin seven-year-old daughters. The cases are pending trial. Garrett was in custody awaiting trial on federal methamphetamine charges at the time of his indictment.

District of South Carolina, Criminal No. 90–319), all the members of the jury panel received a pamphlet promoting "jury nullification" at their home address prior to trial. The prosecutor believes that the HAMC was responsible for the mailing. (*See* AUSA Moore's letter to affiant, dated November 26, 1991, with pamphlet attached, appended hereto at C).

4. In 1983, in the case of *United States v. Carl Lee Wortman, et al.* (United States District Court, Northeastern District of Ohio, Eastern Division, Case No. CR83–130), the Government filed a motion *in limine* to prevent disclosure of the identity, address and residence locale of petit jurors. The Motion (appended hereto at D) described in detail various attempts by the HAMC to interfere with the judicial process (see in particular pages 1–4).

5. In *United States v. Steven Wayne Yee, et al.* (United States District Court, Northern District of Ohio, Western Division, Case No. 3:89CR0720), the Government filed a motion for anonymous jury and for rules governing the conduct of spectators. The Motion and supporting documents (appended hereto at E) again reviewed the history of HAMC attempts to subvert justice in the State of Ohio and elsewhere.

6. Detective Nicholas Barone of the Connecticut State Police testified as an expert witness on the HAMC at the detention hearing held in this case on October 15, 1991. Barone, who has investigated outlaw motorcycle gangs for over fifteen years, described the Hells Angels' penchant for violence and willingness to harm or intimidate anyone cooperating with law enforcement. (*See* Transcript of Hearing, *United States v. Charles Pasciuti* and *United States v. Charles Casella*, October 15, 1991, pages 89–93, 118–120 appended hereto at F).

7. In 1984, Judge James J. McGettrick of the Cuyahoga County (Ohio) Common Pleas Court, told an undercover ATF agent (who the judge believed was associated with the HAMC) that he had been payed bribes to fix two cases where the defen-dants were members of the HAMC. The judge claimed that he was still owed money. Later, the agent, while wired, payed the judge an additional $5,000, which was subsequently recovered from the judge's home along with newspaper articles about the fixed cases. The judge was convicted of bribery and the conviction was affirmed on appeal. The facts are described in *State v. McGettrick,* 40 Ohio App.3d 25, 531 N.E.2d 755 (1988).

*D. Pretrial Publicity*

The case has received significant pretrial publicity to date (see collection of newspaper articles appended hereto at G). The defendants' arrests on October 3, 1991 were covered by both television Channel 9 (Manchester) and Channel 60 (Merrimack).

/s/Clyde R.W. Garrigan
Clyde R.W. Garrigan
Assistant U.S. Attorney

Sworn and subscribed to before me this 31st day of March, 1992.

/s/Linda McAllister
Justice of Peace

APPENDIX A

United States District Court
Southern District of New York

United States of America

—v—

Paul Francis Casey, a/k/a "K.C.," and Brendan Manning, Defendants.

SSS 85 Cr. 428 (PNL)

State of New York
County of New York
Southern District of New York

AFFIDAVIT IN SUPPORT OF GOVERNMENT'S MOTION TO IMPANEL AN ANONYMOUS JURY WITH APPROPRIATE SAFEGUARDS

RICHARD G. MARTINEZ, being duly sworn, deposes and says:

1. I am a Special Agent of the Federal Bureau of Investigation presently assigned to the Organized Crime Drug Enforcement Task Force, New York, New York. I re-

spectfully submit this affidavit in support of the Government's motion for the impanelment of an anonymous jury with appropriate safeguards.

2. Upon information and belief, it has been a consistent practice of the Hell's Angels Motorcycle Club ("HAMC") nationwide to take steps involving intimidation when HAMC members stand trial. The following information is based upon my interviews and discussions with various knowledgeable law enforcement personnel across the country.

3. Upon information and belief, in or about July 1977, Margo Compton testified on behalf of the prosecution in a California state criminal prosecution against the HAMC. At that time, Compton was residing in a rural area of Oregon with six year old twin daughters. While in the process of writing an autobiography of her life with the HAMC, she, her daughter, and a nineteen year old male friend were shot to death, execution-style.

4. On or about January 30, 1978, Detective William Zerby of the Solano County, California Sheriff's Office was injured as a result of an explosive device detonated as he was entering a vehicle parked in front of his home. Detective Zerby was en route to court in a matter involving several members of the HAMC. Two HAMC members were subsequently arrested for conspiracy to commit murder. In or about November 1978, HAMC member James Brandes stated to a reporter for *Rolling Stone Magazine:* "Zerby drew a line and stepped over it. I don't take that from anybody in the streets, and I sure ain't gonna take that from him. I don't let nobody come around and shove me around. I don't think anyone does—if he's a man."

5. During the recent trial of George Christi, President of the Ventura, California HAMC chapter, the court permitted members of the HAMC to enter the courtroom wearing their "colors." According to the United States Marshals in attendance at the trial, witnesses were threatened by HAMC members in the audience. In addition, HAMC members were present when several jurors left the courthouse. On one occasion, a juror was followed to his vehicle.

/s/Richard G. Martinez
RICHARD G. MARTINEZ
Special Agent
Federal Bureau of Investigation

Sworn to before me this 4th day of September, 1987.

/s/Pearl Zwirn

NOTARY PUBLIC

PEARL ZWIRN

Notary Public, State of New York

No. 31–4729864

Qualified in New York County

Commission Expires Feb. 28, 1989

United States District Court
Southern District of New York

United States of America

–v–

Paul Francis Casey, a/k/a "K.C.," and
Brendan Manning, Defendants.

SSS 85 Cr. 428 (PNL)

State of New York
County of New York
Southern District of New York
SUPPLEMENTAL AFFIDAVIT

JAMES J. McGUIRE, being duly sworn, deposes and says:

1. I am an Assistant United States Attorney for the Southern District of New York. I submit this Supplemental Affidavit in further support of the Government's motion for an anonymous jury and other relief. Upon information and belief, the data contained herein is true and correct and is based upon conversations with and documentation provided by other law enforcement officials.

2. On July 27, 1969, Carol Lane was forcibly raped by four members of the San Diego Chapter of the Hells Angels. After filing charges against those members, she was subjected to threats and intimidated into leaving the San Diego area, and she refused to testify in court.

3. On February 7, 1975, Officer John McGee stopped a member of the Bridgeport, Connecticut Chapter of the Hells Angel for speeding and issued him a citation. The club member threatened Officer McGee with physical harm because the citation was issued. While returning to his residence at the end of his shift, Officer McGee observed a stalled vehicle. He stopped to assist the occupants. At that time he was attacked by three members of the Bridgeport, Connecticut Chapter of the Hells Angels and beaten with a baseball bat. He was hospitalized in critical condition.

4. In November 1976, then Deputy District Attorney J. Leslie Duchnick received confidential information from a local defense attorney that members of the Hells Angels wanted to kill Mr. Duchnick. Mr. Duchnick was then assigned to the Special Operations Division of the District Attorney's Office and was prosecuting several cases filed against members of the San Diego Chapter of the Hells Angels.

5. During February 1977, a bomb exploded near the car of San Jose Police Sergeant John Kracht. Sergeant Kracht was in charge of all motorcycle gang investigations for the San Jose Police Department. He had been involved in arresting several members of the Hells Angels, and he had testified against club members on several occasions.

6. On August 8, 1977, Margo Compton, her twin 6 year-old daughters, and a 19 year-old boy, who was a friend of the family, were found murdered in Ms. Compton's home in Oregon. All four people had been executed by gunshot. Shortly prior to her murder, Ms. Compton had testified against Buck Garrett, a member of the Oakland Chapter of the Hells Angels in a criminal trial in the San Francisco area. Law enforcement has learned that Ms. Compton was murdered by an associate of the Hells Angels, because she testified against Mr. Garrett.

7. In late 1977, Robert Provau jumped bail causing the Hells Angel Motorcycle Club to forfeit more than $30,000 in bonds.

Also, when Mr. Provau left San Diego, he owed a personal debt to the San Diego Chapter's president, Thomas Renzulli. Both these offenses are considered capital offenses within Hells Angels club. The club was afraid that Mr. Provau, if apprehended, would cooperate with law enforcement officers rather than go to prison where he would be killed because of his transgressions against the club. Consequently, a "contract" was put out for Mr. Provau. In part, on several occasions members of the San Diego Chapter of the Hells Angels went to New York to search for Mr. Provau. James Brent Eaton, a Hells Angel, who was then in New York, personally spoke to Larry Ditmars, aka "Dexter", a former member of the San Diego Chapter of the Hells Angels and a present member of the Vallejo Chapter of the club, Raymond Piltz, aka "Fat Ray", a former member of the San Diego Chapter of the Hells Angels, now deceased, and one David Harbridge about their searching for Mr. Provau to kill him. Also, Paul Vauchelet, aka "Tattoo Paul", a member of the San Diego Chapter of the Hells Angels, was assigned by the club to work with the bondsman in an attempt to locate Mr. Provau, so he could be killed by the club.

8. On the morning of January 30, 1978, Solano County Deputy Sheriff, William Zerbe was leaving his residence enroute to court to testify against members of the Oakland Chapter of the Hells Angels. As Deputy Zerbe entered his car, a bomb was detonated by remote control. Deputy Zerbe received severe injuries to his back, legs, and ears. He has retired from law enforcement because of medical disability.

9. In February 1978, two prospects in the San Diego Chapter of the Hells Angels, Robert Johnson, aka "Mexican Mike", and William Peters, aka "Filthy Bill", were arrested while surveilling the residence of District Attorney Investigator Ray Morgan. Mr. Morgan had been investigating several crimes, including the instant charges, which had been committed by members of the Hells Angels. Mr. Morgan had arrested and testified against many Hells Angels. Search warrants were issued for the residences of Johnson and

Peters. In Johnson's residence a "hit kit" containing a .45 calibre machine gun, a .22 calibre semi-automatic pistol with a silencer, ammunition for both guns, rubber gloves, a camouflage-type poncho, and a hand drawn map to Mr. Morgan's house was found. An electronic eavesdropping device—a parabolic microphone—was found in Peters' residence. Mr. Morgan retired from law enforcement. He is presently in hiding in another part of the country.

10. In March 1982, Robin Waugh was walking her dog in Ocean Beach, California. When her dog began fighting with another dog belonging to Michael Rush, aka Mickey Canyon, a member of the San Diego Chapter of the Hells Angels, an argument started. Mr. Rush severely beat Miss Waugh, breaking her nose and cracking her ribs. Mr. Rush then told her that if she called the police she would be killed. Later that month Miss Waugh again saw Mr. Rush in the beach area. She told her boyfriend, who confronted Mr. Rush. Both men had weapons, but Ms. Waugh's boyfriend, Douglas Pittman, turned and ran away. Mr. Rush chased him and beat Mr. Pittman with a hammer causing severe head injuries. Two days later Mr. Rush, accompanied by Ronald "Dirt" Liquori, another member of the San Diego Chapter of the Hells Angels, and Roland Eddy, a club associate, approached Miss Waugh and Mr. Pittman near their Ocean Beach home. They threatened to kill Miss Waugh and Mr. Pittman if they told the police or testified against Mr. Rush. Both Mr. Rush and Mr. Liquori have been convicted of felony witness intimidation, and Mr. Eddy pled no contest to misdemeanor witness intimidation. Mr. Rush was also convicted of assault with a deadly weapon.

11. In May 1982, the Akron, Ohio Police Department conducted a search at the Akron Clubhouse of the Hells Angels. Akron Police Captain Jerry Foys was involved in the search. Thereafter, the Akron Chapter of the Hells Angels attempted to hire a man to kill Captain Foys.

12. In October of 1982, Jack Gentry, a member of the Cleveland, Ohio Chapter of the Hells Angels was tried in Ohio for the murder of a rival motorcycle club member. Hells Angels from all over the country showed up at the trial. Sonny Barger, then President of the Oakland Chapter, and Sandy Alexander, President of the New York Chapter, were both present. During the trial, the son of one juror was approached and told that if his mother returned a verdict of guilty, she would have "lots of problems." The person who contacted the juror's son described the juror and what she had worn to court that day. The juror became so frightened that she had to be excused from the trial.

13. In late 1982, law enforcement officers received information that the Cleveland, Ohio Chapter of the Hells Angels had issued a "contract" for the murder of a Cleveland Alcohol, Tobacco, and Firearms agent, who had been involved in the investigation of several murders committed by members of the club. The information came from a confidential source in great detail, including where the killing would take place. The people planning these events knew the agent was going to fly to a particular location and then drive from that location to a law enforcement seminar in a nearby locality. Contact was made with the ATF agent involved, and it was confirmed that he was going to go to the law enforcement seminar on the dates specified by the informant via the route specified by the informant. This information was not public knowledge.

14. Numerous informants have advised law enforcement officers that it is a *modus operandi* of the Hells Angels to threaten and/or kill witnesses to prevent them from testifying in court *and* to try to intimidate or influence jurors. According to these sources, the Hells Angels do not always carefully discriminate between targets of intimidation, preferring to do what is necessary to secure the desired results. As the other materials on file with the Court indicate, these practices have continued up to and including recent times. Moreover, this case may result in very extensive disclosure about the club's activities and could

well engender general discomfort and ill feeling among its members.

15. Upon information and belief, a number of Hells Angels trials have been conducted with anonymous juries, one as recently as 1986 in the Northern District of New York before Judge Munson. Should the Court desire, the Government will endeavor to provide additional details.

/s/James J. McGuire
JAMES J. McGUIRE
Assistant United States Attorney

Sworn to before me this 18th Day of September, 1987

/s/Pearl Zwirn

NOTARY PUBLIC

PEARL ZWIRN

Notary Public, State of New York

No. 31-4729864

Qualified in New York County

Commission Expires Feb. 28, 1989

APPENDIX B

In the United States District Court for the Middle District of North Carolina Winston–Salem Division

United States of America

v.

Timothy Jay Blackwell
Harold Dean Cheek
Otis Buck Garrett
Eldon Bernard McCann
William Sanders

CR–90–128–01–WS
CR–90–128–02–WS
CR–90–128–03–WS
CR–90–128–04–WS
CR–90–128–05–WS

MOTION FOR LIST OF NUMBERED JURORS

NOW COMES the United States of America, by and through Robert H. Edmunds, Jr., United States Attorney for the Middle District of North Carolina, and moves to have jurors selected without revealing their names or addresses. In support of its Motion, the United States of America states the following:

1. The defendants are members of different chapters of the Hells Angels Motorcycle Club ("HAMC"), an organization proved to be involved in numerous types of criminal activity on a nationwide basis with a propensity for violence. The defendants are charged with serious drug offenses involving the distribution of methamphetamine and could receive lengthy prison sentences.

2. From observations of trials involving HAMC members in Kentucky and elsewhere, (*United States v. Barger, et al.,* CR–87–154–L(J), (W.D.Kentucky)), it is standard for the HAMC to direct members to attend trial *en masse* in order to intimidate jurors. Each member is directed to wear his HAMC insignia, sit in the courtroom during trial, and congregate in public areas during recesses in order to be observed by government witnesses and jurors. A deliberate effort is made to cause jurors to be apprehensive for their own safety and the safety of their families.

3. Accordingly, the government requests the selection of jurors without disclosure of their names and addresses. Anonymous juries are warranted in cases such as this one involving organized crime and are not unconstitutional. *United States v. Tutino,* 883 F.2d 1125, 1132 (2nd Cir.1989); *United States v. Persico,* 832 F.2d 705, 717–718 (2nd Cir.1987), *cert. denied,* [486 U.S. 1022] 108 S.Ct. 1995 [100 L.Ed.2d 227] (1988); *United States v. Scarfo,* 850 F.2d 1015, 1021 (3rd Cir.1988). The appropriate *voir dire* by the Court will assure that the defendants are not deprived of the necessary information for the intelligent exercise of their peremptory challenges. *United States v. Scarfo, supra* at 1022. Despite anonymity, appropriate *voir dire* can eliminate any "risk that providing jurors with anonymity would cast unfair aspersions" on the defendants. *United States v. Persico, supra* at 717.

4. There is a very substantial risk in the present case that HAMC members from other areas and other chapters will be present throughout trial and attempt to intimidate and harass jurors. The limited degree

of juror anonymity requested is reasonable under the circumstances and will not impair the defendants' rights or deprive them of a fair trial.

This the 1st day of May, 1990.

Respectfully submitted,
ROBERT H. EDMUNDS, JR.
United States Attorney
/s/Harry L. Hobgood
HARRY L. HOBGOOD
NCSB # 6209
Assistant United States Attorney

In the United States District Court
for the Middle District of North Carolina
Winston–Salem Division

United States of America

v.

Timothy Jay Blackwell,
also known as "Tiny,"
Harold Dean Cheek
Otis Buck Garrett
Eldon Bernard McCann
William Sanders,
also known as "Hangtown,"

CR–90–128–01–WS
CR–90–128–02–WS
CR–90–128–03–WS
CR–90–128–04–WS
CR–90–128–05–WS

### AFFIDAVIT IN SUPPORT OF MOTION FOR LIST OF NUMBERED JURORS

I, Charles Terry Norman, hereby affirm that the following is a true and accurate statement provided by me voluntarily:

1. I was a member of the Hell's Angels Motorcycle Club ("HAMC") between 1979 and 1989 and was associated with the Winston–Salem, North Carolina chapter.

2. During 1988, the East and West Coast Officers of the HAMC directed that every club throughout the United States send members to Louisville, Kentucky for the trial of *United States v. Barger, et al.*, CR–87–154–L(J) (W.D.Kentucky).

3. Members were directed to wear their colors and sit in the courtroom during trial to intimidate jurors and government witnesses. Members were directed to congregate in public areas of the courthouse during breaks in trial and to be seen around Louisville during the evening. Additional motorcycles were brought in by trailer to be parked near the courthouse to give the impression that there were even more members than actually were present. Every effort was also made to attract the attention of the media and warn the public that the HAMC was present in force.

4. All members of the Durham and Winston–Salem, North Carolina chapters of the HAMC traveled to Louisville and participated in intimidating jurors and witnesses.

5. This procedure has also been used to influence verdicts in other federal and state trials involving HAMC members.

This the 1 day of June, 1990.

/s/Charles Terry Norman
CHARLES TERRY NORMAN

**514**

## U.S. Department of Justice

*United States Attorney*
*District of South Carolina*

November 26, 1991

*1100 Laurel Street*
*Post Office Box 2266*
*Columbia, South Carolina 29202*
*(803) 765-5483*
*FTS/677-5483*

*Old Post Office Bldg.*
*83 Broad Street*
*Post Office Box 978*
*Charleston, South Carolina 29402*
*(803) 724-4381*
*FTS 677-4381*

*Federal Building, Room 310*
*300 E. Washington Street*
*Post Office Box 10067*
*Greenville, South Carolina 29603*
*(803) 232-5646*

Clyde Garrigan, Esquire
Assistant United States Attorney
U. S. Attorney's Office
55 Pleasant Street
Post Office Box 580
Concord, New Hampshire 03302-0480

*John L. McMillan Federal*
*Building, Room 365*
*401 W. Evans Street*
*Post Office Box 1567*
*Florence, South Carolina 29503*
*(803) 665-6688*

Dear Mr. Garrigan:

Enclosed please find a copy of the pamphlet that was distributed to all members of the jury panel in the case in which a Hell's Angel, Timothy "Tiny" Blackwell, was a defendant. That case was captioned United States of America v. Dennis George, et al., Criminal No. 90-319. The jury for this case was selected in October of 1990 and the case was tried shortly thereafter. The FBI attempted to investigate the mailings of these pamphlets, but could not come up with a case for prosecution. This is the only case of which I am aware that pamphlets were mailed out to prospective jurors in this district in the past three to four years. Obviously, it is our belief that the Hell's Angels were responsible for the mailing of this pamphlet.

.I hope this will be of some assistance to you. If you don't mind, please send me a copy of your Motion for an Anonymous Jury and accompanying memoranda when you have a chance.

If I can be of any further assistance to you, please do not hesitate to contact me. With warm regards, I am

Very truly yours,

E. BART DANIEL
UNITED STATES ATTORNEY

BY _____
MARK C. MOORE
Assistant United States Attorney

MCM:ccm

pages of history shine on instances of the jury's exercise of its prerogative to disregard instructions of the judge; for example, acquittals under the fugitive slave law." Other federal courts have recently affirmed the right of jury veto power.

"IN OTHER WORDS, JURORS STILL RETAIN THE RIGHT TO REFUSE TO CONVICT A DEFENDANT OF BREAKING WHAT THEY FEEL IS A BAD LAW, BUT THEY'RE NO LONGER TOLD ABOUT IT."

*FIJA* — *THE "FULLY INFORMED JURY AMENDMENT" is both a political and an educational campaign to inform American citizens about their rights as jurors.*

*Many states permit passage of laws or amendments to their constitutions by direct votes of the people (the initiative process). In these states, FIJA will be a ballot-issue campaign to require judges to inform every juror that he may base his verdict upon the facts of the case, the merits of the law, and his own sense of right and wrong.*

*As an organization, FIJA will sponsor educational media campaigns, encourage lobbying efforts aimed at persuading state lawmakers to reform court procedures, and assist grass roots efforts to inform jurors of their rights.*

**WE WANT EVERY POTENTIAL JUROR IN AMERICA TO KNOW THE TRUTH!**

**YOU CAN HELP!** *Just contact FIJA'S National Headquarters, Box 59, Helmville, Montana 59843. Phone (406) 793-5550. Or contact your state's FIJA organization:* Po 7814, Columbia, SC 29202

803-798-2278

4

# TRUE OR FALSE ?

**When you are asked to sit on a jury, you have a right to vote according to your conscience.**

1

TRUE... BUT it's very unlikely the judge will tell you this, because he doesn't have to.

Instead, the judge is likely to say that you may consider "only the facts" of the case, and may not let your opinion of the law or the motives of the defendant affect your decision.

This is a serious problem. How can anyone expect to get a truly fair trial if the jurors aren't told of their right to judge the law as well as the facts of the case?

A lot of people don't get fair trials. Too often, jurors end up apologizing to people they've voted to convict, just because they thought they "had to" vote for a guilty verdict based upon the facts alone.

"BUT IF ALL THIS IS TRUE", YOU ASK, "WHY DOESN'T THE JUDGE SIMPLY TELL THE JURY ABOUT IT?"

Obviously, an uninformed jury is something which should never occur in a country whose state and federal constitutions all guarantee every accused person the right to a fair trial by a jury of his peers.

But it's a sad fact of life that judges generally don't want ordinary citizens making decisions about the law, even if it is their country. So they deliberately don't tell jurors their full range of rights and powers.

This lack of information undermines the whole idea of judgment by a jury of one's peers, whereby a cross section of ordinary people from the community is supposed to consider both the law and its own standards of right and wrong in order to reach a just verdict.

Most Americans are aware of their right to trial by jury, but few know that the jury always has the power to judge according to conscience, regardless of the law and the facts of the case. Why don't we know this? Because we were never told — in school, in movies or television shows about trials, or even in most law schools!

The FULLY INFORMED JURY AMENDMENT (FIJA) is a way to tell EVERYBODY about jurors' rights, where it counts — in the courtroom.

The idea of FIJA is to revitalize the plan for America developed by its founders. They saw jurors as the key to our continuing freedom, because the jury was to have the final say on any law American citizens were expected to obey.

Our third president, Thomas Jefferson, put it this way: "I consider trial by jury as the only anchor yet imagined by man, by which a government can be held to the principles of its constitution."

John Adams, our second president, had this to say about the juror: "It is not only his right, but his duty... to find the verdict according to his own best understanding, judgment, and conscience, though in direct opposition to the direction of the court."

"SO WHAT BECAME OF THIS RIGHT?"

From colonial times until just less than a hundred years ago, it was routine for the judge to inform jurors of their full range of rights. But during the late 1800's, special-interest pressure inspired a series of judicial decisions which sought to limit the jurors' right to judge the law, by refusing to allow discussion of the issue in the courtroom.

While no court has dared deny that jurors have the power to acquit despite the evidence or the law, judges still regularly contend that jurors must be kept in the dark, and may not be told they have this power. Defense attorneys who know about it still occasionally manage to have it included in the instructions given the jury, but risk being cited for contempt of court if they bring it up without the judge's approval.

Still, this power of the jury continues to be recognized, as in 1972, when the D. C. District Court of Appeals held that the jury has an "unreviewable and irreversible power... to acquit in disregard of the instruction on the law given by the trial judge... the

APPENDIX D

United States District Court
Northern District of Ohio
Eastern Division

United States of America, Plaintiff,

v.

Carl Lee Wortman, et al., Defendants.

Case No. CR 83–130

Judge David D. Dowd, Jr.

GOVERNMENT'S MOTION IN LIMINE TO PREVENT DISCLOSURE OF THE IDENTITY, ADDRESS AND RESIDENCE LOCALE OF PETIT JURORS

Filed Oct. 24, 1983

The trial of the Defendants herein is presently scheduled to commence on October 31, 1983, with the selection of the jury beginning on that day. For the reasons hereafter discussed, the government requests that the Court issue an order directing the Clerk of the United States District Court for the Northern District of Ohio, Eastern Division, to place under seal the names and addresses of all individuals summoned as prospective jurors herein. It is further requested that said names and addresses not be released to attorneys for either the government or the defendants at any time before, during or after the trial and that the jury selection procedure be conducted in such a manner so as to insure complete anonymity to all members of the jury.

## MEMORANDUM

### I. *Facts*

The Defendants are both acknowledged members of the Hells Angels Motorcycle Club, an internationally organized group with local chapters in Cleveland and Akron. Since late 1982, members of the Hells Angels have been defendants in several state trials in various local jurisdictions within the confines of the Northern District of Ohio. While the subject matter of the trials is not relevant to this motion, the conduct and tactics employed by the Hells Angels should be viewed with grave concern by anyone interested in the fair administration of justice.

It is the contention of the government that a consistent pattern of subtle jury intimidation has been practiced by members of the Hells Angels who are associated with defendants in criminal trials in this district.[1] This intimidation, regardless of how subtle it may appear, has a direct impact on the ability of petit jurors to assess the evidence in an impartial manner.

The tactics utilized by the Hells Angels in a state trial in Toledo, Ohio, in October, 1982, best illustrate the pattern which has emerged.[2] There a member of the Cleveland chapter of the Hells Angels was on trial for an offense that occurred in the Toledo area, which is a stronghold of the Hells Angels arch-rival Outlaw Motorcycle Club. During the course of the trial, members of the Hells Angels wearing colors constantly packed the courtroom and mingled in the hallways of the Courthouse. And, in addition to Hells Angels from Cleveland and Akron, members from all over the United States were present at the trial. Hells Angels also stationed themselves at the exits from the Courthouse, prompting several jurors to request that

---

1. Outlaw motorcycle groups historically have actively participated in the intimidation of witnesses on a large scale. When this fails to alter the result of a trial, juror intimidation is the next logical step. This is true not only of the Hells Angels but also of other groups comprising the Big Four outlaw motorcycle groups, the Pagans, Outlaws and Banditos, as well as numerous regional and local motorcycle gangs.

*See: Hearings Before The Committee On The Judiciary, United States Senate, Organized Crime In America,* S.Hrg. 98–184, Serial No. J–98–2, Part I, 1983.

2. The government is prepared to present testimony from Lucas County authorities regarding the matters discussed herein.

security personnel accompany them as they left for the day.

Also during the trial, the son of one juror was approached in a bar and was told that if his mother returned a verdict of guilty she would have "lots of problems". The person who contacted the juror's son described the juror and what she wore to court that day. The juror in question was so frightened that she requested to be dismissed from the panel, a request that was granted by the trial judge.[3] The final incident in this trial occurred after the case concluded with the acquittal of the defendant. Each juror was contacted at home and invited to a luncheon given by the Hells Angels at the Sheraton–Westgate Hotel in Toledo.

During the fall of 1982, a member of the Akron chapter of the Hells Angels was tried in that city. Again, Hells Angels from various parts of the country were present, displaying their colors and constantly maintaining a large presence in the courtroom.[4]

In early 1983, a trial occurred in Cleveland in which a member of the Cleveland chapter was the defendant. The courtroom scenario described above was repeated once again and additionally, members of the Hells Angels made it a point to constantly stare at the members of the jury.

Finally, in October, 1983, another state trial took place in Akron in which a Cleveland Hells Angel was the defendant. On September 28, 1983, in preparation for that trial, a list of the prospective jurors in that case was provided to attorneys for the defense and the state. That same evening a suspicious car was observed driving up and down a street in Akron where two of the prospective jurors lived. The car contained two bearded individuals and was found to be registered to an Akron Hells Angel.[5]

---

**3.** Attorneys for the Hells Angels disavowed any knowledge of the threat.

**4.** The government can present photographs taken in the courtroom which illustrate what was seen by the jurors.

Significantly, in three of the four instances alluded to above, Alan P. Caplan, the attorney for Mr. WORTMAN, represented the defendants. In at least one of those cases Gary Eisner, the attorney for Mr. RIBICH, was also counsel of record.

## II. Law

Federal judges are vested with broad discretion in the conduct of *voir dire*. *Aldridge v. United States*, 283 U.S. 308, 310 [51 S.Ct. 470, 471, 75 L.Ed. 1054] (1931); *United States v. Black*, 685 F.2d 132 (5th Cir.1982); *United States v. Barnes*, 604 F.2d 121 (2nd Cir.1979), *cert. denied*, 446 U.S. 907 [100 S.Ct. 1833, 64 L.Ed.2d 260]. Absent an abuse of discretion in the conduct of *voir dire*, and a showing that the rights of the accused were prejudiced thereby, a conviction will not be disturbed on appeal. *United States v. Banks*, 687 F.2d 967 (7th Cir.1982); *United States v. Black, supra*.

In *United States v. Barnes*, 604 F.2d 121 (2nd Cir.1979), *cert. denied*, 446 U.S. 907 [100 S.Ct. 1833, 64 L.Ed.2d 260], the United States Court of Appeals for the Second Circuit affirmed the decision of the District Court ordering non-disclosure of juror's identities, residence locales and ethnic background.

*Barnes* was a narcotics prosecution trial in the Southern District of New York. Because of the history of violence associated with narcotics cases in that district the government sought a pre-trial order which would assure the anonymity of the prospective jurors as well as those ultimately selected to sit. In its moving papers the government directed the Court's attention to three recent cases of similar import in which there had been attempts made to influence jurors. *Barnes, supra*, n. 3 at 134. Recognizing the corruptive effect such tactics have on the entire criminal justice system, the trial court granted the

---

**5.** The government is also prepared to present testimony regarding this incident.

government's motion and the names and addresses of the jurors were withheld from all parties. On appeal the defendants claimed a violation of due process on the grounds that questioning anonymous jurors prevented the defense from obtaining complete and accurate information regarding the prospective veniremen.

The Court of Appeals categorically rejected these arguments, noting that all information deemed to be relevant to the intelligent exercise of challenges for cause, as well as peremptory challenges, could be elicited from jurors who remained anonymous.

In reaching this conclusion, the court discussed the procedure followed in the selection process. In that process, the district court called 150 prospective jurors, assigning each a number. This was followed by the trial judge addressing a number of standard questions to the entire panel, which resulted in numerous jurors being excused for cause. The court then addressed certain questions submitted by the parties to individual jurors, including their county of residence and length of time in the community. A family history was also elicited as well as information concerning each juror's occupation, educational background, and membership in organized groups. In short, counsel for both sides were able to ascertain virtually every relevant fact except the juror's name and address.

Both procedurally and logistically then, any added burden on the trial court or court personnel was minimal.

In reviewing the reasons behind the selection of an anonymous jury, the Court of Appeals took note of the serious nature of the charges as well as the "sordid history" of narcotics cases in the Southern District. It found that this was sufficient to put the trial court on notice that all safety measures possible should be taken for the protection of prospective jurors. *Barnes,* at 135.

The Court also specifically rejected the argument that jurors must disclose their identities and publicly take responsibility for the decisions they made.

This, . . . is not the law—and should not be. If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If "the anonymous juror feels less pressure" as the result of anonymity, this is as it should be—a factor contributing to his impartiality. The court's decision as to anonymity and sequestration comported with its obligation to protect the jury, to assure its privacy, and to avoid all possible mental blocks against impartiality. *Id.* at 140, 141.

The argument may well be advanced that no events have thus far occurred in this case which would give rise to the degree of concern expressed by the government. In recognizing that trial judges are charged with the responsibility of providing protection for jurors, witnesses and counsel, the Court in *Barnes* stated that:

It can be no answer that no untoward event had occurred up to the opening of the trial. The trial judge had to take such steps as might be necessary in advance to avoid such an event. Cases need not be cited to prove the adage of the futility of locking the barn door after the horse has escaped. *Barnes* at 137.

Moreover, the government here, as in *Barnes,* has demonstrated to the Court that trials in this district involving members of the Hells Angels are filled with tactics that are expressly designed to intimidate jurors. And, it would be a mistake to make a distinction between overt acts of intimidation such as actual contact with a juror or his family and the more subtle type of intimidation that has been practiced here. Both are equally effective in destroying a juror's ability to impartially view the evidence.

In addition, once the jury is selected and the names made public, there is no effective remedy which could serve to remove

fear from the jurors.[6] When presented with the need for precautions such as exists here, the district court must act before the jury is selected. It is not enough to simply attempt to control the actions of courtroom observers, for the psychological damage is already complete in the minds of the jurors.

Nor does it matter from whom the intimidation or threats may emanate, for in most cases that will not be known. As stated by Judge Friendly in *United States v. Borelli*, 336 F.2d 376 (2nd Cir.1964), *cert. denied*, *sub nom. Cinquegrano v. United States*, 379 U.S. 960 [85 S.Ct. 647, 13 L.Ed.2d 555] (1965):

> Courts must protect the integrity of criminal trials against this kind of disruption, whether it emanated from defendants' enemies, from their friends, or from neither. *Id.* at 392.

Any vigorous opposition to the government's motion will serve to underscore the need for the remedy requested. As recognized by the *Barnes* court, there simply is no need to know the names and addresses of the prospective jurors in order to participate intelligently in the *voir dire* process. While some defense attorneys believe that such information is necessary to enable them to perform pre *voir dire* investigations of the jurors, the Second Circuit determined that the right of jurors to serve without fear outweighed any advantage of such investigations.

> If the giving of names and addresses had been required so that investigation could have been made in the neighborhood or from their families as to their characteristics, any semblance of an impartial jury would have been destroyed. Fear of re-

taliation against themselves or members of their families would inevitably have been uppermost in their minds during their deliberations. Sequestration would have been no protection in the event of a guilty verdict. And since communication with their families during sequestration would have been permitted, a mere threat to the family of one juror would have permeated the entire jury. *Barnes*, at 141.

### CONCLUSION

The government has placed the Court on notice that jurors sitting on cases in this district which involve Hells Angels have been subjected to various forms of harassment,[7] however subtle, that can only be construed as deliberate attempts to intimidate. The sole purpose of such tactics can only be to inject fear into the jury deliberation process so that the jury's ultimate decision is based not just on the evidence but also on jurors thoughts of retaliation.

And, while such fear may not permeate all of the jurors, it need only affect one to achieve the desired result. As the court in *Barnes* stated:

> It will not do to say that, because there were no actual threats received in the case at bar, Judge Werker's action was inappropriate, for the circumstances were such that the suggestion of disruption was manifest. *Barnes, supra*, at 141.

Here the pattern established in other cases suggests that disruption of the integrity of the jury system is manifest,[8] and that precautionary measures should be taken to insure the anonymity of the jurors selected herein. Such an action would

---

6. Some courts have sought to achieve the required protection by simply refusing to disclose the addresses of the jurors. *Johnson v. United States*, 270 F.2d 721 (9th Cir.1959). However, it was recognized in *United States v. Gibbons*, 602 F.2d 1044 (2nd Cir.1979), *cert. denied*, 444 U.S. 950 [100 S.Ct. 421, 62 L.Ed.2d 319], that "except for persons with particularly common names, there is easy resort to the telephone directory to find the address of a particular juror." *Id.* at 1050. This procedure thus affords no protection from the psychological intimidation that the government wishes to prevent.

7. As alluded to previously, another tactic employed regularly by Hells Angels in the courtroom is to stare constantly at various members of the jury.

8. The government is prepared to present additional evidence to the Court regarding this matter, on an *ex parte, in camera* basis. Such a proffer would be made a part of the record and sealed.

serve to minimize the element of fear in the minds of the jurors, for they would feel secure in knowing that the defendants and their associates would not know who they are.

It is respectfully requested that relief be granted in accordance with the views expressed herein.

> Respectfully submitted,
> J. WILLIAM PETRO
> United States Attorney
> /s/By: Steven R. Olah
> STEVEN R. OLAH
> /s/David O. Bauer
> DAVID O. BAUER
> Special Attorneys
> Criminal Division
> U.S. Department of Justice

## APPENDIX E

United States District Court
Northern District of Ohio
Western Division

United States of America, Plaintiff,

v.

Steven Wayne Yee, et al., Defendants.

Case No. 3:89 CR 0720

JUDGE John W. POTTER

MAGISTRATE JAMES G. CARR·

GOVERNMENT'S MOTION FOR AN ANONYMOUS JURY AND FOR RULES GOVERNING THE CONDUCT OF SPECTATORS

Filed May 31, 1990.

Now comes the Government and moves this Honorable Court for an Order directing that the names, addresses and locations of employment of all persons summoned as prospective jurors for this case shall not be disclosed to either the defendants or to the government at any time before, during and after the trial. The Government further requests that this Court issue an order governing the conduct of spectators at the trial herein so as to minimize any possible intimidation of witnesses and/or jurors.

## MEMORANDUM

### I. *Facts*

The defendants are acknowledged members of the Hell's Angels Motorcycle Club, an internationally organized group with local chapters in the Northeast Ohio area. As the Sixth Circuit has expressly noted, the Hell's Angels is "a motorcycle gang known for violence." *United States v. Frazier*, Case No. 88–3003 at 7 (unpublished) (Sept. 1, 1988) (copy attached hereto as Exhibit 1). Since 1982, members of the Hell's Angels have been defendants in a number of trials in various courts in Northeast Ohio. During several of these trials (the subject matters of which are not relevant hereto), non-defendant members of the Hell's Angels have engaged in various forms of both subtle and very blatant intimidation of jurors. Examples of such intimidation, which can be eradicated only by granting the relief sought herein, are set forth below.

In October, 1982, members of the Hell's Angels engaged in various forms of juror intimidation in connection with a state court trial, held in Toledo, Ohio, of a Hell's Angel member.[1] During the course of the trial, Hell's Angels members packed the courtroom and mingled in the hallways of the courthouse, dressed in full colors. Numerous members of the Hell's Angels from all over the United States stationed themselves at the exits from the courthouse, prompting several jurors to request that security personnel accompany them as they left at the end of each day. The son of one juror was approached by a member in a bar and was told that his mother would have "lots of problems" if she returned a verdict of guilty. The Hell's Angels member then described the juror and the clothing she had worn to court that day. This juror was so frightened that she requested to be dismissed from service and this request was granted. During this trial, several mem-

---

1. The government is prepared to present testimony regarding the conduct of the Hell's Angels members during this trial.

bers of the Hell's Angels appeared near the homes of a number of jurors, and while there was no evidence showing jurors were directly contacted, neighbors and acquaintances of jurors were contacted.

During the fall of 1982, a member of the Akron Chapter of the Hell's Angels was tried in that city. Once again, Hell's Angels members from various parts of the country were present, displaying full colors and constantly mounting a large presence in the courtroom. In early 1983, at a trial in Cleveland, a similar courtroom scene was played out, with numerous members in full colors staring at the jury throughout a trial of a Hell's Angels defendant.

In October of 1983, another state court trial took place in Akron involving a Hell's Angels defendant. On September 18, 1983, a list of prospective jurors was provided to attorneys for the defense and for the state. That same evening, a suspicious car was observed driving up and down a street in Akron where prospective jurors lived. The car contained two bearded individuals and was found to be registered to an Akron member of the Hell's Angels.[2]

As a result of the foregoing incidents, U.S. District Court Judges David D. Dowd, Jr. and Alvin J. Krenzler entered orders concerning the conduct of spectators at two Federal court trials of Hell's Angels in 1983 and 1984. These orders, among other things, prohibited displaying an insignia which identified a person with a particular club, imposed a dress code requiring a shirt, a tie and a jacket, and required all spectators to register and to present photographic identification as a condition of entry to the courtroom. These orders were signed in the cases of *United States v. Wortman, et al.*, Case No. CR 83–130 and in *United States v. Caronite*, Case No. CR 84–166A. Assistant United States Attorney David Bauer of Toledo was the prosecutor in these cases.

More recently, the Hell's Angels have engaged in similar acts of intimidation in other jurisdictions. In a currently ongoing federal court case in the Middle District of North Carolina, the government is also requesting an anonymous jury. This request is being supported by the affidavit of a former Hell's Angels member who just recently began to cooperate with the government. A copy of this affidavit is attached hereto[3] and details show the Hell's Angels engaged in a systematic effort to intimidate jurors and government witnesses during a recent trial of a Hell's Angels member in Louisville, Kentucky. From this affidavit, it appears that the intimidation of witnesses and jurors is certainly continuing and there is every reason to believe these tactics will occur in this case if this requested relief is not granted.

## II. *Legal Analysis and Argument*

Defendants Steven Yee, Mark Verdi and John Ray Bonds are charged with various federal firearm violations which arose from the February 27, 1988 murder of David Hartlaub. There can be no doubt as to the seriousness of these charges and the fact that each of the defendants is facing a long prison term. In addition, the defendants have also been charged on the state level with murder and if convicted, face the possibility of either the death penalty or life in prison. The murder charges are also the result of the events surrounding David Hartlaub's death.

As this Court is well aware, this case has attracted considerable media and public attention. Reporters from numerous newspapers and press wire service, including the Toledo Blade, Sandusky Register and the Associated Press have attended several of the hearings that have been held in this case. Defendants Yee and Verdi have consented to at least one television interview in Toledo. In addition, the courtrooms utilized in this case have been crowded with other members or associates of the Hell's Angels motorcycle club and interested spectators. Against this backdrop, it be-

---

**2.** The government is prepared to present testimony regarding this incident.

**3.** A signed copy of the affidavit will be submitted to the Court (see unsigned copy of affidavit of Charles Terry Norman, attached hereto as Exhibit 2).

comes abundantly clear that steps must be taken to ensure that the jury ultimately empaneled in this case be afforded the freedom to observe the testimony, and ultimately deliberate, without the possibility of taint and outside influences.

In similar situations, numerous courts have utilized anonymous juries in order to protect the integrity of the judicial process. *See e.g., United States v. Edmond,* Case No. Cr 89–0162 [730 F.Supp. 1144] (D.D.C. Feb. 5, 1990) (Richey, J.); *United States v. Tutino,* 883 F.2d 1125 (2d Cir.1989); *United States v. Scarfo,* 850 F.2d 1015 (3d Cr.), *cert. denied,* [488 U.S. 910] 109 S.Ct. 263 [102 L.Ed.2d 251] (1988); *United States v. Persico,* 832 F.2d 705 (2d Cir.1987), *cert. denied,* [486 U.S. 1022] 108 S.Ct. 1995 [100 L.Ed.2d 227] (1988); *United States v. Ferguson,* 758 F.2d 843 (2d Cir.), *cert. denied,* [474 U.S. 841] 106 S.Ct. 124, 125 [88 L.Ed.2d 102] (1985); *United States v. Thomas,* 757 F.2d 1359 (2d Cir.) *cert. denied,* [474 U.S. 819] 106 S.Ct. 67 [88 L.Ed.2d 54] (1985).

In reviewing the aforementioned cases, it is apparent that this Court, in deciding whether to empanel an anonymous jury, must balance both the interests of the criminal justice system and the interests of the defendants. The judicial system's interests include protecting the jurors, witnesses and their families from intimidation and violence (whether actual or threatened), the need for the jurors to be able to hear evidence and deliberate freely without outside influences and pressures, and the need to protect both jurors and witnesses from potential taint and extensive trial-related publicity. The defendants' interests obviously include the need to conduct a meaningful, intelligent voir dire which will permit the intelligent exercise of their peremptory challenges, and retaining their presumption of innocence.

During the court's balancing of the rights of both the people of the United States and the defendants, the following factors should be, and have been, considered by the courts: 1) the seriousness of the offenses charged, and whether the defendants are alleged to be part of a group that possesses the means to harm, intimi-

date, or improperly influence jurors; 2) whether the defendants or the group with which they are associated have engaged in the past in attempts to interfere with the judicial process; and 3) the amount of pretrial publicity. *See United States v. Barnes,* 604 F.2d 121, 141 (2d Cir.1979), *cert. denied,* 446 U.S. 907 [100 S.Ct. 1833, 64 L.Ed.2d 260] (1980) (holding that use of an anonymous jury did not deprive defendants of the right to probe meaningfully juror's potential biases); *United States v. Thomas, supra,* 757 F.2d at 1364–65; *United States v. Persico,* 621 F.Supp. 842, 878 (D.C.N.Y.1985) (conducting a searching voir dire alleviated the risk that providing jurors with anonymity would cast unfair aspersions on defendants), *aff'd,* 832 F.2d 705 (2d Cir.1987).

As has already been noted, the charges against the defendants are extremely serious and the defendants are facing substantial periods of incarceration if they are convicted of the charges which have been filed. The facts set forth in the factual portion of this motion demonstrate that members and associates of the Hell's Angels Motorcycle Club have used both subtle and open forms of intimidation and attempts to influence the jurors and witnesses in numerous cases. In addition, there have been, and will continue to be, substantial pretrial publicity associated with this case.

The defendants' rights to empanel a fair and impartial jury is not hindered in any way by the use of an anonymous jury. The right to challenge prospective jurors theoretically enables counsel to eliminate individuals whose manifest or suspected biases render them incapable of reaching an impartial verdict. *See Lewis v. United States,* 146 U.S. 370, 376 [13 S.Ct. 136, 138, 36 L.Ed. 1011] (1882) [1892]; *Rosalez–[Rosales]Lopez v. United States,* 451 U.S. 182, 198 [101 S.Ct. 1629, 1639, 68 L.Ed.2d 22] (1981) (adequate voir dire is necessary for judge to discover bias in prospective jurors and for counsel to exercise peremptory challenges intelligently). A challenge for cause is based on an actual admission of bias or on a response that betrays a prejudice judicially recognized as mandating au-

tomatic dismissal. *See* V. Star and M. McCormick, Jury Selection § 10.4 at 303. Peremptory challenges require no justification and reflect an attorney's instincts, hunches or suspicions about prospective jurors who cannot be challenged for cause. Merely omitting the name, address and workplace of the veniremen will not result in the denial of the defendants' right to select a jury of his or her choice. As the court in *Barnes, supra* noted, there is no requirement that the jury must disclose their identity. "This ... is not the law—and should not be. If a juror feels that he and his family may be subjected to violence or death at the hands of the defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If the anonymous juror feels less pressure as a result of his anonymity, this is as it should be—a factor contributing to his impartiality." *Barnes, supra,* 604 F.2d at 1412 [140–141]. Indeed,

> "the virtue of the jury system lies in the random summoning from the community of twelve "indifferent" persons—"not appointed until the hour of trial"—to decide a dispute, and in their subsequent, unencumbered return to their normal pursuits. *See* 3 W. Blackstone, Commentaries 378.... Because the system contemplates that jurors will inconspicuously fade back into the community once their tenure is completed, anonymity would seem entirely consistent with, rather than an athema to, the jury concept. In short, we believe that the probable merits of the anonymous jury procedure are worthy, not of a presumption of irregularity, but of disinterested appraisal by the courts."

*Scarfo, supra,* 850 F.2d at 1023.

This Court also has the inherent supervisory authority to conduct its courtroom proceedings in a manner that is conducive to the due administration of justice. *See e.g., United Sttes [States] v. Birdman,* 602 F.2d 547, 558 (3d Cir.1979), *cert. denied,* 444 U.S. 1032 [100 S.Ct. 703, 62 L.Ed.2d 668] (1980); *United States v. Gonsalves,* 691 F.2d 1310, 1315–16 (9th Cir.1982). As such, it is requested that this Court establish the same rules regarding courtroom

attire and conduct that the Honorable Alvin I. Krenzler and the Honorable David D. Dowd, Jr., both of the Northern District of Ohio have utilized in past cases involving Hell's Angels, such as requiring all male spectators to be suitably dressed in a shirt, normal necktie and coat or jacket as a condition of admission to the courtroom; prohibiting all insignias which identify a spectator, male or female, with any club or organization; requiring as a condition to entry that all spectators register at a table situated at the entrance to the courtroom and show photographic identification; requiring that no spectator be allowed to enter or leave the courtroom other than at recesses; allowing no spectators to take notes during the voir dire of the jury; allowing no spectators to bring into the courtroom magazines, newspapers, briefcases or notebooks unless the spectator is a member of the media; and whatever other courtroom conditions that this Court deems appropriate to ensure the due administration of justice.

## III. *Conclusion*

WHEREFORE, for all the foregoing reasons, the government does respectfully request this Court to issue an order which prohibits the disclosure of prospective jurors' names, addresses and places of employment to both the government and to the defense and further establish specific rules of courtroom conduct as outlined above in addition to whatever other rules this Court might deem appropriate.

Respectfully submitted,
JOYCE G. GEORGE
United States Attorney
/s/By: <u>Ann C. Rowland</u>
ANN C. ROWLAND
Reg. No. 0015156
/s/ <u>Michael T. Rae</u>
MICHAEL T. RAE
Reg. No. 0001986
/s/ <u>James R. Wooley</u>
JAMES R. WOOLEY
Reg. No. 0033850
Assistant U.S. Attorneys

EXHIBIT 1

No. 88–3003

United States Court of Appeals
for the Sixth Circuit

United States of America,
Plaintiff–Appellee,

v.

Richard C. Frazier, Defendant–Appellant.

On Appeal from the
United States District Court for the
Northern District of Ohio.

Filed Sept. 1, 1988.

Before: MARTIN, GUY, and NELSON,
Circuit Judges.

PER CURIAM.

Defendant, Richard Frazier, entered a Fed.R.Crim.P. 11(a)(2) conditional plea to a charge of possession of a firearm by a convicted felon. 18 U.S.C.App. II § 1202(a)(1). Prior to his plea, Frazier had filed a motion to suppress evidence of the firearms which were seized when a search warrant was executed at his residence. At the conclusion of the suppression hearing, the district judge denied the motion. On appeal, Frazier claims the trial judge should have conducted an *in camera* hearing relative to the identity of a confidential informant whose information provided part of the probable cause for the issuance of the warrant. Judge Dowd declined the *in camera* hearing request. Upon review, we conclude the district judge properly exercised his discretion and accordingly, we affirm.

I.

On October 23, 1986, a confidential informant told Detective Robert Kingzett of the Cleveland Police Department that he had visited within the past twenty-four hours a residence located at 3470 Sleepy Hollow Road in Medina County, Ohio, and had observed three automobiles in a barn located on the premises. The informant related to Kingzett that an individual known to the informant as "Friz" had told him that the vehicles were "insurance jobs" from Cleveland. The informant further stated that while he was present, "Friz" and another man, "Tony," had been disassembling the automobiles. The informant also told Kingzett that one of the cars, a 1984 white Cadillac Eldorado Biarritz, belonged to someone named "Vicnellie."

Kingzett enlisted the support of Jeffrey Burlingame, a detective with the Medina County Sheriff's Department. Burlingame said he knew a "Friz" who lived on Sleepy Hollow Road and provided Kingzett with defendant's name. Burlingame later drove by defendant's house and observed a jeep automobile similar to one of the autos referenced by the informant.

Kingzett also attempted to verify that someone named "Vicnellie" had reported an auto theft but was unable to do so. On the way to the Medina County Court of Common Pleas where Kingzett was to have the search warrant authorized, he received a radio call informing him that a "Victor Nelli" had reported the theft of a 1984 white Eldorado Biarritz. On the basis of this additional information, considered along with the original search warrant affidavit, the warrant issued. Kingzett had also represented to the issuing magistrate that the confidential informant had provided reliable information in the past.

When the search warrant was executed, the officers found a jeep automobile with altered vehicle identification numbers, but no trace of the other two vehicles mentioned by the informant.[1] The search also turned up a 9 mm and .380 caliber pistol which ultimately were the basis for the subsequent federal prosecution.

---

1. The jeep was removed from the premises before the officers could confirm it was stolen and never recovered.

## II.

The search warrant that issued recited that the informant had seen the vehicles in question within twenty-four hours of the issuance of the warrant. This was an inadvertent error. Although the informant had initially told Kingzett he had seen the vehicle within twenty-four hours, by the time the warrant issued, considerably more time had elapsed. When Frazier filed his motion to suppress, he filed affidavits from himself and his wife denying that anyone other than the Fraziers had been on the property within the twenty-four hours prior to the execution of the warrant except a neighbor delivering hay. On the basis of these affidavits, the district court determined to hold a *Franks*[2] hearing to look into the truth of the search warrant affidavit. Frazier also filed a motion to compel disclosure of the identity of the informant.

At the hearing, Detective Kingzett testified to the information he had received from the informant, the corroborating information he had developed, and the circumstances surrounding the issuance and execution of the search warrant. Frazier and his wife testified along the lines of their affidavits and also testified that their barn was "so full of junk" that you could not get three automobiles inside.

Frazier also presented the testimony of three other persons who partially corroborated his statements. Clarence Kereky testified that he had delivered hay to the property on the day before the search and that the barn contained too many automobile parts to leave room to park an automobile. Kereky also stated that he owned property across the road from defendant's residence, but had never seen any of the vehicles mentioned in the warrant. Randy Pearce, Frazier's neighbor, also testified

that he had never seen these automobiles on the premises or seen or heard any signs of cars. Finally, Steven Keresztesi, who was present when the police executed the search warrant, further corroborated that the interior of the barn was cluttered.

At the conclusion of the hearing, the trial judge found Kingzett to be a credible witness. The judge noted that when Kingzett got the original tip he did not know Frazier and that he had acted responsibly in his efforts to corroborate the information received. The court denied the motion to compel the disclosure of the informant.

## III.

There is no doubt since the decision in *Franks* that a defendant may challenge the truthfulness of the statements made in an affidavit supporting a search warrant. The Supreme Court made it clear, however, that a presumption of validity attaches to the affidavit supporting the warrant and that a defendant may not challenge the truthfulness of the information attributed to an informant contained in the affidavit. "The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant." *Franks v. Delaware*, 438 U.S. at 171 [98 S.Ct. at 2684].

Unlike the situation in the majority of cases in which a *Franks* challenge is made, a hearing was actually held here.[3] The affiant testified and was cross-examined. Under such circumstances the district court's conclusion as to the affiant's credibility is reviewed under a clearly erroneous standard.[4] *United States v. Ritter*, 752 F.2d 435 (9th Cir.1985); *United States v. Langley*, 466 F.2d 27 (6th Cir.1972). The facts are such here that even under a *de*

---

**2.** *Franks v. Delaware*, 438 U.S. 154 [98 S.Ct. 2674, 57 L.Ed.2d 667] (1978).

**3.** *See United States v. Giacalone*, No. 87–1924 [853 F.2d 470] (6th Cir. Aug. 5, 1988).

**4.** The district court found that the warrant's inaccurate statement regarding the timing of the

informant's visit to defendant's property was inadvertent. Also, the fact that none of the vehicles mentioned by the informant were found on the property does not mean that they were never there. Detective Kingzett testified at the suppression hearing that an experienced car thief could dismantle an entire automobile in eleven minutes.

*novo* standard of review, we clearly would reach the same conclusion as did Judge Dowd.

It is equally clear, apart from any considerations implicated by *Franks*, that the defendant was not entitled to disclosure of the informant. The decision whether the government must disclose the name of an informant must be made by balancing "the public interest in protecting the flow of information against the individual's right to prepare [a] defense." *Roviaro v. United States*, 353 U.S. 53, 62 [77 S.Ct. 623, 628, 1 L.Ed.2d 639] (1957). Also the prosecution ordinarily need not disclose the name of an informant when the defendant seeks the information solely to challenge the probable cause supporting a warrant. *McCray v. Illinois*, 386 U.S. 300 [87 S.Ct. 1056, 18 L.Ed.2d 62] (1967). The question of disclosure is left, in the first instance, to the sound discretion of the trial judge. *United States v. Sharp*, 778 F.2d 1182, 1187 (6th Cir.1985), *cert. denied*, 475 U.S. 1030 [106 S.Ct. 1234, 89 L.Ed.2d 342] (1986).

It is of additional significance here that the defendant was charged with a firearms offense and not auto theft or possession of stolen property. Thus, the disclosure of the informant's identity would not have aided Frazier in his defense on the substantive charge. *United States v. De Los Santos*, 810 F.2d 1326 (5th Cir.), *cert. denied*, [484 U.S. 978] 108 S.Ct. 490 [98 L.Ed.2d 488] (1987).

The government also had a strong and legitimate interest in protecting the identity of the informant. Detective Kingzett's affidavit recited that this informant had provided information that had led to the recovery of fifty-five stolen automobiles and the conviction of approximately fifteen individuals. In addition, defendant was a member of the Hell's Angels, a motorcycle gang known for violence. Thus, both the safety and future usefulness of the informant were protected by nondisclosure of the informant's identity.

AFFIRMED.

EXHIBIT 2

In The United States District Court for the Middle District of North Carolina Winston–Salem Division

United States of America

v.

Timothy Jay BLACKWELL,
also known as "Tiny,"
Harold Dean Cheek
Otis Buck Garrett
Eldon Bernard McCann
William Sanders,
also known as "Hangtown,"

CR–90–128–01–WS
CR–90–128–02–WS
CR–90–128–03–WS
CR–90–128–04–WS
CR–90–128–05–WS

AFFIDAVIT

I, Charles Terry Norman, hereby affirm that the following is a true and accurate statement provided by me voluntarily:

1. I was a member of the Hell's Angels Motorcycle Club ("HAMC") between 1979 and 1989 and was associated with the Winston–Salem, North Carolina chapter.

2. During 1988, the East and West Coast Officers of the HAMC directed that every club throughout the United States send members to Louisville, Kentucky for the trial of *United States v. Barger, et al.*, CR–87–154–L(J) (W.D.Kentucky).

3. Members were directed to wear their colors and sit in the courtroom during trial to intimidate jurors and government witnesses. Members were directed to congregate in public areas of the courthouse during breaks in trial and to be seen around Louisville during the evening. Additional motorcycles were brought in by trailer to be parked near the courthouse to give the impression that there were even more members than actually were present. Every effort was also made to attract the attention of the media and warn the public that the HAMC was present in force.

4. All members of the Durham and Winston–Salem, North Carolina chapters of the HAMC traveled to Louisville and par-

ticipated in intimidating jurors and witnesses.

5. This procedure has also been used to influence verdicts in other federal and state trials involving HAMC members.

This the ____ day of May, 1990.

CHARLES TERRY NORMAN

APPENDIX F*

United States District Court
for the District of New Hampshire

United States of America

v.

Charles Pasciuti

United States of America

v.

Charles Casella

No. Cr. 91–63–1–S

No. Cr. 91–63–2–S

The above-captioned matters came on for hearing before Magistrate William H. Barry, Jr. in the United States District Court, 55 Pleasant Street, Concord, New Hampshire, on Tuesday, October 15, 1991, commencing at 2:10 p.m.

*Court Reporter:*

Diane M. Sacco, CSR, RPR

MR. NATOLA: Objection, your Honor. Your Honor—

THE COURT: Overruled.

MR. VICINANZO: Thank you, your Honor.

Q. What role does the—does violence play within the club?

A. Very important role.

Q. Why do you say that?

A. The Hell's Angels as an organization thrive on violence and they make it very clear to people outside of that organization who do business with them that that is the ultimate price you will pay for crossing a

Hell's Angel for doing anything that's going to question the integrity of the club itself, the way they look at it, and to bring any problems that bear on the Hell's Angels organization or individual, that's usually attended to by violence perpetrated by a member as far as that individual.

Q. What sort of—does this include any particular category of persons against whom violence or is it someone—is it more general?

A. They would perpetrate the violence against some of their own members if the case—if it was necessary.

Q. Would this violence extend to a situation where a person's providing evidence against individual Hell's Angels?

A. Yes.

Q. To what extent would the violence be taken in your opinion?

A. It depends. If a person were to become a possible witness against a Hell's Angel in the prosecution, for instance, then the Hell's Angels would make every effort, first of all, to identify this individual and, if possible, to make sure in their way that this person did not testify or certainly had a change of heart, and if he was insistent upon it, other than the fact that this individual being in some type of protective custody situation, they would make sure physically that this individual would not be able to testify if they had the ability to do so.

Q. Do you have an opinion about their ability to identify and take care of informants and witnesses?

A. They have the ability. Their problem in a lot of cases is the inability to identify some of these people. I think that if they were able to do that, they certainly would be carrying these acts out more frequently, but the fact of the matter is they do have a difficult time in some cases identifying people who are about to testify. If it gets into a trial situation, it's probably too late for them.

Q. And you mentioned they have the ability in your experience, and in your opin-

* Editor's Note: Selected portions of transcript provided by the Court for publication.

ion as an expert, what sort of means or standard procedure might be taken to identify and take care of witnesses?

A. Well, if a particular member is—you have to remember that the organization—if someone is going to testify against the organization or an individual in the organization, they are testifying against the Hell's Angels. That's the way they look at things.

Q. I'm sorry; could you repeat that?

A. When a person is going to testify against an individual Hell's Angel, as far as the Angels are concerned they view that as testifying against the organization as a whole. It's an affront to the organization, not just the individual member.

Q. By the individual, do you mean the local chapter or the organization? Do you mean the local chapter or something broader than that?

A. I mean the entire Hell's Angels organization, internationally. An affront to an individual is an affront to the entire organization itself.

Q. When you say affront, what do you mean?

A. Well, it means that if a person—generally they have an understanding when they do business with the club that this kind of behavior does not occur. You do not testify against the Hell's Angels. This is the way they deal with people, and if someone has the audacity to turn around and decide to cooperate and to testify against them, then they will handle this matter in their own particular way.

Q. And what would that way be in your experience?

A. Generally through violence or intimidation to the point where they would convince this individual not to testify.

Q. What if they could not convince the individual not to testify?

A. Then they would make every effort to silence the individual. If it meant killing the individual, they would make every effort to do so.

MR. VICINANZO: Your Honor, just a moment.

(Pause.)

MR. VICINANZO: Thank you, Detective Barone. No more questions, your Honor.

MR. NATOLA: May I inquire, your Honor?

THE COURT: Certainly. Go right ahead.

## CROSS-EXAMINATION
### BY MR. NATOLA:

Q. Detective Barone, turning your attention to the area of inquiry that you just testified about, you testified I believe that among the things that the organization might do is convince an individual not to testify against an individual member; correct?

## REDIRECT EXAMINATION
### BY MR. VICINANZO:

Q. Detective Barone, do you make a distinction between the term—between witnesses who provide information inculpating Hell's Angels members or associates and witnesses who provide testimony that's harmless or amounts to nothing?

A. Yes.

Q. Which are in danger?

A. I'm sorry?

Q. Which are in danger? Which type of witness is in danger?

A. The type of witness who testifies about any kind of activity—criminal activity that a member of the Hell's Angels may be involved in or may have committed over a period of time, whatever, somebody who has witnessed a particular Hell's Angel committing a particular crime, who's been a part of the drug distribution network where the Hell's Angels participate. Could be participated in a robbery or a drug transaction or stealing a car, a burglary or something like that, where a person physically either witnessed the act or participated with the Hell's Angels in a particular act. These types of witnesses are the ones I'm referring to.

Q. If no lay witnesses—just assuming hypothetically no lay witnesses who are

testifying before the grand jury provided any sort of inculpatory evidence against a Hell's Angel member or associate, then none of those witnesses are in danger; is that correct?

MR. HAIGHT: Objection.

THE COURT: Sustained. If there is no evidence, there is no indictment.

MR. VICINANZO: I use the word lay and I did preface my remark with it was a hypothetical question, your Honor. Let me rephrase it then.

Q. If the defendants were unaware whether or not any of the witnesses had provided inculpatory testimony, would any of those witnesses be in danger?

A. If they were unaware that they provided—

Q. Yes.

A. Probably not.

Q. In your opinion what efforts would be made to find out?

A. They would make an effort to determine who said what to whom. That's generally what they want to do. They want to find out, for instance, if they were able to determine, who provided the most damaging testimony to their particular operation, so to speak. They would certainly zero in on this person or persons who were going to hurt them the most. If somebody was just providing general information, I doubt very much they'd even be considered. They may make an effort to just have their presence known to this individual. Take it a step further beyond that; to an individual who could really create some problems legally for the club or that individual could really have some problems.

Q. I think you said earlier that you didn't know whether or not or you thought that whether or not the defendants were incarcerated, they still could direct others to do things for them from jail; isn't that correct?

A. They could do that, yes.

# THE ☀ SUN

FRIDAY, OCTOBER 4, 1991 LOWELL, MASSACHUSETTS

## Officials hope Angels' arrests will stop 'speed'

By MARCIA CASSIDY
Sun Staff

Authorities are hoping the indictments of 13 present and former members of the Hell's Angels will wipe out a burgeoning distribution of methamphetamine — "speed" — in New England.

A federal grand jury handed up the indictments last week, and 10 of the 13 men indicted were arrested yesterday, police said. The other three were being sought.

The president of the Hell's Angels chapter in Lowell, Charles "Doc" Pasciuti, 45, was arrested at dawn when state police and members of the federal Bureau of Alcohol, Tobacco and Firearms raided his home at 47 River St., Westford.

Charles Casella, 37, of Westford, whom authorities described as Pasciuti's bodyguard, was also arrested.

New Hampshire U.S. Attorney Jeffrey Howard said authorities will seek to hold Pasciuti and Casella without bail as "dangers to the community."

The 13, who Howard said are all present or former Hell's Angels, are charged with conspiracy to distribute methamphetamine, known as speed, from 1987 through last month.

Pasciuti, who Lowell police said was released from prison in 1985 after serving time for assault and battery, was also charged with operating a continuing criminal enterprise, being a convicted felon in possession of a firearm and other firearms offenses.

In Lowell, George Caruso, 37, of 26 Carroll Parkway, was arrested at his home, police said.

U.S. Attorney Jeff Howard, left, announces yesterday the indictments of 13 men, including Charles 'Doc' Pasciuti, 45, of Lowell, on drug charges. New Hampshire Attorney General John Arnold looks on. AP PHOTO

Caruso is alleged to be a key member of the Lowell Angels' chapter, according to police.

Cassella and Caruso were also indicted for violations of federal firearms statutes

Police were still searching for 31-year-old David Beaton, of Lowell, also alleged to be a member of the Lowell chapter of the Hell's Angels.

Please see ARRESTS 4

# Officials hope arrests stop 'speed'

ARRESTS/From Page 1

Howard said yesterday that additional arrests are possible.

Lowell police Lt. Ed Davis also said that taking Pasciuti away "will effectively shut that organization down." He said the Lowell chapter, which stretches into Lynn, controls other motorcycle groups in New Hampshire.

New Hampshire Attorney General John Arnold said the four-year investigation was an effort to shut down the Angels' growing drug and weapons flow into New England.

"This prevents them from getting a foothold and selling their wares in the state," Arnold said.

"They (the Angels) are the recognized national leader in the manufacture and distribution of this drug, and they had made inroads in the southern part of the state," Arnold said.

The indictments allege they conspired to distribute the drug from the Long Ranch Saloon in Derry, the Home Run Restaurant in Nashua, and the Hell's Angels clubhouse on Carter

Avenue, off Gorham Street, in Lowell. Howard said the indictments charge distribution of at least one kilogram of the drug, with a street value of at least $100,000, but he said that was only a small percentage of the amount allegedly involved.

Howard said some of the defendants also are alleged to have tried to hinder the grand jury's investigation by threatening witnesses.

Bail hearings are expected next week, he said.

Agents from the Bureau of Alcohol, Tobacco and Firearms also raided Pasciuti's home in May 1990, seizing several weapons and arresting Anthony Morabito. Morabito, named in the indictments last week, is charged in New York with the murder of a teen-ager in a Fourth of July fireworks explosion.

In the 1970s, authorities described Pasciuti's home and the house next door at 45 River St. as hangouts of the Hell's Angels.

In 1987, while Pasciuti was in prison, his wife, Mary Jane, was stabbed to death inside his home by a Hell's Angels associate.

Davis said the Lowell chapter had remained dormant in the early 1980s, but re-emerged about three years ago.

In the late 1980s, organized crime experts said the Hell's Angels, although retaining their image as a leather-clad biker gang, had evolved into a sophisticated crime syndicate.

The remaining indictments were David Skelton, 35, John Janiak, 30, and Ronald Skelton, 39, all of Derry, N.H., allegedly members or associates of the Iron Eagles Motorcycle Club, and John Courtois, 37, of Northwood, N.H., is a present or former member of the Angels, Howard said.

The others are David Machado, 28, and Kevin Marchand, 30, of Fall River; Lawrence Machado, 33, of Swansea.; John Pasciuti, 31, of Southborough; and Morabito, 43, of New York.

All but Beaton, Ronald Skelton and Marchand had been arrested.

# Motorcycle Gang Members Indicted on Drug Charges

THE UNION LEADER, Manchester, N.H. — Friday, October 4, 1991

**From Wire, Staff and Special Reports**

Thirteen men tied to the Hell's Angels and other motorcycle clubs have been indicted on drug charges in an attempt to end the Angels' presence in New Hampshire and the Lowell, Mass., area, authorities said yesterday.

A federal grand jury handed up the indictments last week, and 10 of the men were arrested yesterday, including alleged ring leader Charles "Doc" Pasciuti, U.S. Attorney Jeffrey Howard told a news conference. The other three were being sought, and additional arrests were possible, he said.

Pasciuti and seven others are from Massachusetts; four are from New Hampshire, and one is from New York City.

They are charged with conspiracy to distribute methamphetamine, known as speed, from 1987 through last month. The indictment alleges they conspired to distribute the drug from the Long Ranch Saloon, 12 Railroad Ave., Derry, the Home Run Restaurant and Pub, 56 Canal St., Nashua, and the Hell's Angels' clubhouse in Lowell.

Howard said those properties could be seized under federal statute allowing properties used in drug operations to be taken, although a decision has yet to be made in that regard.

According to the indictment, returned by a federal grand jury sitting in Concord, the gang utilized its authoritative position within the national Hell's Angels Motorcycle Club to exploit members of motorcycle gangs including the Iron Eagles Motorcycle Club of Derry and the Rebel Riders Motorcycle Club of Nashua to carry out a nearly four-year dis-

**DRUG BUST, Page 12**

## DRUG BUST

**(Continued From Page One)**

tribtion of substantial quantities of methamphetamine beginning in 1987.

The 45-year-old Pasciuti, who Lowell police said served jail time until 1985 on battery and assault charges, also was charged with operating a continuing criminal enterprise, being a convicted felon in possession of a firearm and other firearms offenses. He is president of the Lowell chapter of the Hell's Angels.

Howard said some of the defendants also are accused of trying to hinder the grand jury's investigation by threatening witnesses.

He said authorities will seek to hold Pasciuti and Charles Casella, who both are from Westford, Mass., without bail as "dangers to the community." Casella allegedly is Pasciuti's bodyguard.

Seven of the Massachusetts men appeared before a federal magistrate in Boston yesterday.

Each of the defendants, appearing during a late afternoon hearing before federal magistrate Marianne Bowler, waived extradition to New Hampshire to answer the charges and were taken into custody by U.S. Marshals who will hold and transfer them to Concord for a bail and detention hearing next week.

Howard said the indictments charge distribution of at least one kilogram of the drug, with a street value of at least $100,000, but he indicated that was only a small percentage of the amount allegedly involved.

Lowell Police Lt. Ed Davis also said that taking Pasciuti away "will effectively shut that organization down." He said the Lowell chapter, which stretches into Lynn, Mass., controls other motorcycle groups in New Hampshire.

"That is one of the intended possibilities," Howard said.

Pasciuti allegedly attempted to hide his illegal drug enterprise and present an appearance of legitimacy by making substantial contributions to charitable organizations, the indictment charges. During his court apprearance yesterday, Pasciuti wore a T-shirt boosting "The 44th annual Golden Gloves Championships sponsored by Lowell Sun Charities."

David Skelton, 35, John Janiak, 30, and Ronald Skelton, 39, all of Derry, allegedly were members or associates of the Iron Eagles Motorcycle Club, and John Courtois, 35, of Northwood is a present or former member of the Angels, Howard said.

Also indicted were: Anthony Morabito, 43, New York City; George Caruso, 37, Lowell; David Beaton, 31, Lowell; David Machado, 28, Fall River, Mass.; Lawrence Machado, 33, Swansea, Mass; Kevin Marchand, 30, Fall River, Mass.; John R. Pasciuti, 31, Southborough, Mass.

In addition to Charles Pasciuti, defendants Cassella, Caruso and John Pasciuti were also indicted for violations of federal firearm statutes. It is alleged as well that some of the defendants attempted to hinder a federal grand jury investigation into their activities.

Marchand and the Machados were identified in the indictment as present or former members or associates of the Crazy Eights Motorcycle Club of the Swansea-Fall River, Mass., area.

"This prevents them from getting a foothold and selling their wares in the state," New Hampshire Attorney General John Arnold said.

"They (the Angels) are the recognized national leader in the manufacture and distribution of this drug," he said, "and they had made in-roads in the southern part of the state."

Indictments stemmed from the results of joint investigations by the Federal Bureau of Alcohol, Tobacco and Firearms, New Hampshire State Police, Drug Enforcement Administration, Massachusetts State Police, New York State Police and police departments from Lowell and Westford, Mass.; Derry, Laconia and Nashua.

Also involved were the U.S. Marshals Service and the Internal Revenue Service.

# Hell's Angels club busted, officials say

## Northwood man among those arrested

By MIKE RECHT
Associated Press

The Hell's Angels control over motorcycle clubs in New Hampshire and parts of Massachusetts could be at an end if 13 drug indictments result in convictions, law enforcement authorities say.

Among those arrested is John Courtois, 37, of Northwood. He is a present or former member of the Angels, said U.S. Attorney Jeffrey Howard.

A federal grand jury handed up the indictments last week, and 10 of the men were arrested Thursday, including alleged ring leader Charles "Doc" Pasciuti, who is president of the Angels chapter in Lowell, Mass. The other three were being sought.

Four of the men, ranging in age from 28 to 45, are from New Hampshire, eight from Massachusetts and one from New York City. Howard told a news conference additional arrests were possible.

Lowell police Lt. Ed Davis also said that taking Pasciuti away "will effectively shut that organization down." He said the Lowell chapter, which stretches into Lynn, Mass., controls other motorcycle groups in New Hampshire.

"That is one of the intended possibilities," Howard said.

"This prevents them from getting a foothold and selling their wares in the state," state Attorney General John Arnold said.

"They (the Angels) are the recognized national leader in the manufacture and distribution of this drug," Arnold said, "and they had made inroads in the south-

■ See HELL'S — Page B-8

JON PIERRE LASSEIGNE / AP

Howard, left, and Arnold meet the media.

CONCORD MONITOR Friday, October 4, 1991

## ■ HELL'S Continued from Page B-1

ern part of the state."

The Angels once were the largest and most feared motorcycle gang in the country.

The 13 are charged with conspiracy to distribute methamphetamine, known as speed, from 1987 through last month. The indictments allege they conspired to distribute the drug from the Long Ranch Saloon in Derry, the Home Run Restaurant in Nashua, and the Hell's Angels clubhouse in Lowell.

Howard said the indictments charge distribution of at least 1 kilogram of the drug, with a street value of at least $100,000, but he indicated that was only a small percentage of the amount allegedly involved.

Pasciuti, who Lowell police said served jail time until 1985 on battery and assault charges, also was charged with operating a continuing criminal enterprise, being a convicted felon in possession of a firearm and other firearms offenses.

Howard said some of the defendants also are alleged to have tried to hinder the grand jury's investigation by threatening witnesses.

He said authorities will seek to hold Pasciuti and Charles Casella, who both are from Westford, Mass., without bail as "dangers to the community." Casella is Pasciuti's alleged bodyguard.

Bail hearings are expected next week.

David Skelton, 35, John Janiak, 30, and Ronald Skelton, 39, all of Derry, allegedly were members or associates of the Iron Eagles Motorcycle Club.

The others are George Caruso, 37, and David Beaton, 31, of Lowell; David Machado, 28, and Kevin Marchand, 30, of Fall River, Mass.; Lawrence Machado, 33, of Swansea, Mass.; John Pasciuti, 31, of Southborough, Mass., and Anthony Morabito, 43, of New York.

All but Beaton, Ronald Skelton and Marchand had been arrested.

## Mass. Hells Angels Members Try For Bail in Drug Case

CONCORD — The head of the Lowell, Mass., chapter of the Hells Angels Motorcycle Club and his brother were among those ordered temporarily detained yesterday, pending a full detention hearing next Tuesday before U.S. Magistrate William Barry.

Charles "Doc" Pasciuti, his brother, John, and 11 other men, either full members or associated with the club, had been indicted by a federal grand jury on conspiracy charges in connection with an alleged methamphetamine distribution ring.

The government, represented by Assistant U.S. Attorney David Vicinanzo, will seek to convince Magistrate Barry that the Pasciutis should be held, pending trial, on grounds of probability of flight and endangerment to the community.

● Another prominent Hells Angels member, Charles Cassella, 37, of Westford, Mass., will also face a full detention hearing next Tuesday.

Other gang members rounded up and facing conspiracy charges sought release on bail yesterday, and in some cases were released, on condition that they wear electronic monitoring devices and report their whereabouts periodically to federal authorities pending further hearing.

Full detention issues were not discussed before the magistrate, because not all defendants had obtained permanent legal counsel.

● Putting up his house in Northwood as security was John Courtois, 35, who was ordered to wear an electronic monitoring device and to submit to periodic urinalysis.

Urinalysis was a requirement for all those bailed.

● George Caruso, 37, Lowell, Mass., was required to put his Lowell home up for security as a bail condition.

● David Beaton, 31, of Lowell, was released on posting $5,000 cash security and submitting to electronic monitoring.

● David Machado, 28, of Fall River, Mass., a member of the Crazy Eights Motorcycle Club, was released on condition of posting a $20,000 unsecured bond and submitting to electronic monitoring.

● Lawrence Machado, 33, Swansea, Mass., was ordered to post a $20,000 unsecured bond along with wearing a monitoring device.

● John Janiak, 30, of Derry, a member of the Iron Eagles, was required to put up a $20,000 unsecured bond and then ordered to submit to in-home detention between the hours of 7 p.m. and 6 a.m.

● Anthony "Ginzo" Morabito, 43, New York City, was ordered detained pending trial.

● David Skelton, 35, of Derry, had his case taken under advisement.

● Still at large are Ronald Skelton, 39, address unknown, and Kevin Marchand, 30, of Fall River, Mass.

THE UNION LEADER, Manchester, N.H. — Wednesday, October 9, 1991

536

# WESTFORD EAGLE

Thursday, October 10, 1991          Seventy-five cents

At right, Pasciuti comes out of his house to warn a photographer not to take his picture in December 1989.

# Drug, gun raid on Hell's Angels

By Gail Ferney
Staff Writer

Federal authorities led an early-morning raid on a River Street house last week which resulted in the arrest of two Westford men connected with the Hell's Angels Motorcycle Club. They have been charged with conspiracy to distribute methamphetamine ("speed") and violations of the federal firearms statutes.

Charles "Doc" Pasciuti, 45, and Charles Casella, 37, were arrested at Pasciuti's 47 River Street home shortly after the 7 a.m. raid Oct. 3. According to federal authorities, Pasciuti is the president of the Lowell chapter of the Hell's Angels and an officer in the club's East Coast faction. Casella was described by police as Pasciuti's bodyguard.

In addition to the drug distribution charge, Pasciuti was charged with operating a continuing criminal enterprise, with being a convicted felon in possession of a firearm and other firearms offenses.

Casella was also indicted for federal firearm statute violations.

Pasciuti and Casella are two of 13 Lowell area men indicted by a federal grand jury last week on charges of conspiring to distribute speed from 1987 to September 1991. Ten of the 13 were arrested Oct. 3 as part of the same sweep that netted the Westford men.

The indictments charge that they attempted to distribute the drug from the Hell's Angels clubhouse on Carter Avenue in Lowell, the Long Ranch Saloon in Derry, N.H., and the Home Run Restaurant in Nashua.

The raid was led by the U.S. Attorney's office in New Hampshire and the federal Bureau of Alcohol, Tobacco and Firearms (ATF) in an effort to stem the flow
HELL'S, Page 10

"Doc" Pasciuti's house at 47 River Street (above) was the scene of a May 1990 federal raid in which weapons were confiscated.

# Hell's Angels arrests

■ HELL'S, From Page 1
of drugs and weapons into New England by Hell's Angels members. The Mass. Drug Enforcement Administration, Internal Revenue Service, police in five towns including Westford, and state police from Massachusetts, New York and New Hampshire contributed to the joint investigation.

Besides Pasciuti and Casella, those indicted include David Skelton, John Janiak and Ronald Skelton, alleged members of the Iron Eagle Motorcycle Club from the Derry, N.H., area.; Kevin Marchand and David Machado of Fall River, and Larry Machado of Swansea, alleged present or former members of the Crazy Eights Motorcycle Club; John Pasciuti of Southborough; Anthony Morabito of New York, John Courtois of Northwood, N.H. and George Caruso of Lowell, all present or former members of the Hell's Angels.

Bail hearings are expected next week.

### Previous incidents

In May 1990, ATF agents raided Pasciuti's River Street home and confiscated an undisclosed number of guns and seven illegal knives. Although there were no arrests made in connection with the weapons, that raid led to the arrest of Anthony Morabito, 41, for cocaine posession. Morabito was named in the indictments last week.

Pasciuti's wife, Mary Jane, was stabbed to death in their River Street home on the night of July 2, 1987 by neighbor Roger "Tony" Goudreau. Doc Pasciuti was in prison on an assault charge at the time of his wife's death.

On Jan. 24, 1990, a Lowell Superior Court jury found Goudreau guilty of murder in the first degree. He was sentenced to life in prison in Cedar Junction, Walpole.

## Bail Denied Again to Two Hell's Angels

CONCORD — Two leaders of a Hell's Angels club who were denied bail last October by U.S. Magistrate William Barry will have to remain confined until their trials in May, U.S. District Court Judge Norman Stahl ruled this week.

Club President Charles T. "Doc" Pasciuti and his body guard and club sergeant-at-arms Charles "Chuckie" Casella, both of Westford, Mass., were denied bail by Barry, who found that both were a danger to the community.

Pasciuti is charged with operating a continuing criminal enterprise and with various firearms offenses, and Casella is charged with conspiracy to possess and distribute methamphetamines and transportation of a firearm in interstate commerce.

EXHIBIT II

In The United States District Court for the District of New Hampshire

United States of America, Plaintiff,

vs.

Charles T. Pasciuti et al., Defendants.

No: CR–91–63–01–S

Judge Jose Antonio Fuste

DECLARATION OF ATTORNEY ALAN P. CAPLAN IN SUPPORT OF DEFENDANT CHARLES PASCIUTI'S MOTION TO RECONSIDER THE GRANTING OF PROSECUTION'S MOTION FOR AN ANONYMOUS JURY

I, Alan P. Caplan, hereby state under the pains and penalties of perjury, as follows:

I. I am submitting this declaration in support of defendant Charles Pasciuti's motion to reconsider the granting of the prosecution's motion to empanel an anonymous jury herein.

II. I am an Attorney at Law, and maintain my office at 630 Carolina Street, San Francisco, California, (415) 826–2371.

III. I am a member of the bars of Massachusetts, and of the United States District Courts for the Districts of Massachusetts, Northern District of Ohio, District of Nebraska, and Northern District of California, and of the United States Courts of Appeals for the First, Second, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits.

IV. I have been permitted to appear *"pro hac vice"* in the United States District Courts for the Districts of Vermont, Connecticut, Eastern District of New York, Southern District of New York, Middle District of Florida (Orlando Division), South Dakota, Nebraska, Northern District of Iowa, Northern District of Louisiana, Eastern District of Missouri, Western District of Missouri (Northern Division), Western District of Missouri (Southern Division), Eastern District of Kansas, Northern District of Texas, Colorado, Eastern District of California, and Southern District of California.

V. I was permitted to appear *"pro hac vice"* in the State Courts of New Hampshire, Maine, Rhode Island, Connecticut, New Jersey, Ohio, Nebraska, Iowa, California, and Washington.

VI. I have reviewed all of the pleadings filed by the prosecution in support of its motion seeking the empanelment of an anonymous jury. This declaration will address certain matters set forth in the "GOVERNMENT'S AFFIDAVIT IN SUPPORT OF MOTION FOR ANONYMOUS JURY AND MOTION TO IMPOSE RULES GOVERNING SPECTATORS AT TRIAL" (hereinafter referred to as the "Garrigan Affidavit"). It will not address those aspects of that affidavit which relate solely to the question of the conduct of spectators at trial, because the Order issued by this Court in regard to such conduct is not, save in one respect, objectionable to defendant Charles Pasciuti.[1]

VII. The first subheading of the Garrigan Affidavit contains allegations of "Interference with the Judicial Process in the Present Case". They are based upon "information" presented to AUSA Garrigan by prosecution investigating officers and agents. That "information", in turn, was based upon the statements of prospective prosecution "cooperating witnesses". Therefore, in evaluating such "information", some of the following considerations should be kept in mind:

A. Based upon my experience in similar prosecutions, it is very likely that such witnesses have and will be given incentives and benefits of various kinds in return for their testimony, including financial remuneration and highly favorable treatment in regard to unrelated criminal conduct in which *they* have knowingly and actively participated.

1. The only objection to the Court's order regarding spectators has to do with the taking of notes, and will be addressed in a separate pleading.

B. Many of the assertions in that portion of the Garrigan Affidavit merely parrot allegations contained in Count Two of the Superseding Indictment. Therefore it is appropriate that they be specifically addressed by defendant Charles Pasciuti at trial, rather than in the instant pleading.

C. In the grand jury process which led to the return of the indictments herein, the government has no legal obligation to submit unfavorable information about its witnesses, or information which is exculpatory of a defendant's guilt to the grand jurors who are considering the prosecution's request for action. It does have the power, however, to present such exculpatory and impeaching information to the grand jurors, should it determine that fairness requires such a balanced presentation.[2]

D. In the Garrigan Affidavit, as before the grand jury, the prosecution has elected a path of non-disclosure of exculpatory or impeaching information. It has identified Gaylen Blake and Robin Golden merely as percipient witnesses to certain matters, without disclosing any of the numerous reasons which they, and others mentioned in the Garrigan Affidavit, would have for providing agents and prosecutors with false information which would be considered favorable to the government's position in this case.

E. Based upon my 20 years experience in the defense of criminal cases, I believe that unsworn and unchallenged statements given by these persons to law enforcement officers and agents, or to the grand jurors, should be given minimal credence by a Court. To rely upon such information for this serious decision would be highly inappropriate without defendants being afforded an opportunity to cross-examine such witnesses, or at least those officers and agents who submitted information purportedly provided by such witnesses to AUSA Garrigan.

VIII. The second subsection of the Garrigan Affidavit, entitled "Courtroom Displays and Other Conduct in the Present Case", contains a "mixed bag" of personal observations by the affiant, and hearsay "intelligence" information related to Mr. Garrigan by various law enforcement officers. In regard to such observations it should be noted:

A. In Subparagraph B.1. of the Garrigan Affidavit, the affiant included his perceptions of the behavior of various attendees who are related to the Hells Angels Motorcycle Club (hereinafter referred to as "HAMC") at pretrial hearings in this case. Because those perceptions were offered in support of a claim that there is a *need* to empanel an anonymous jury in this case, and because I believe they reflect nothing more than the personal biases and prejudices of that observer, I would make the following observations in response:

1. There is absolutely nothing which is inherently improper in the fact citizens of the United States choose to exercise their right to attend proceedings in its courts. To the best of my knowledge that choice has not yet been proscribed by the government, even if those citizens happen to be members and prospective members [hereinafter referred to as "prospect(s)"] of the Hells Angels Motorcycle Club (hereinafter referred to as "HAMC").

2. It is significant that the affiant did not suggest that those attendees in any way conducted themselves in an improper, untoward or threatening manner. I have personally attended two of these proceedings, and am aware that HAMC members, families and friends are concerned with the fate of various defendants in this case. They simply wish to give these defendants a visible expression of support by taking the time and trouble to appear and observe such proceedings. It also affords some family members and friends their only opportunity to see their loved-ones other than through glass or bars at a jail.

---

**2.** See the recent United States Supreme Court opinion in *United States v. Williams*, [—— U.S. ——, 112 S.Ct. 1735, 118 L.Ed.2d 352] (1992).

3. In subsection B.1, Garrigan Affidavit, Page 7, the affiant further asserted that he had "observed HAMC members and prospects loitering in the hallway before and after hearings in the present case, conspicuously displaying HAMC insignias."

4. Having observed spectators at criminal court proceedings for the past 20 years, I can state that it is entirely normal, and in no way surprising to see the family members and friends of defendants or witnesses standing or wandering about the courthouse hallways before, during, and after court proceedings. As lay persons, they are often confused and/or in doubt about what has just transpired, and are waiting to speak with the lawyers, in order to gain a better understanding of the events and situations generally.

5. The affiant further attempted to vest this unexceptional behavior and scene with a sinister cloak by employing the expression *"loitering* in the hallway" (emphasis added), to describe it. The only difference I can perceive between "standing" or "waiting around" in a hallway and "loitering in a hallway" is that the latter expression denotes that it is in some way inappropriate for persons to be in a location at a particular time. That was certainly not true after the hearings I have attended in this case.

6. People, including wives, parents and children, and not just HAMC members and prospects, waited after those hearings because they wished to speak with me and with other attorneys. They were concerned about the case, wished to hear our views of what had just happened in court, wanted to ask about the next steps in the case, solicited information about how their friends/family members were feeling, and sought an opportunity to ask us what (if anything) they might do to help. Often I specifically ask such persons to wait for me in the hallway until I have finished talking with my client, or meeting with government counsel and/or with counsel for co-defendants.

7. If there were a cafeteria in the building, or if there were a coffee shop or restaurant right next door to the courthouse, I would suggest that we meet there, because I know that such surroundings would be more relaxed and comfortable than a courthouse corridor. However we, unlike government counsel in this case, do not have expansive offices and facilities within one or two elevator stops from the courtroom. We are constrained to get by as best we can without such amenities.[3]

8. I therefore believe that it was wrong for the prosecution to have made snide comments and drawn adverse inferences about the actions of spectators who have no viable alternatives under the extant courthouse conditions.

9. When defendants are *not* being held in custody, it has been my experience that the courthouse swiftly empties of both defendants and their supporters after each hearing is terminated. Due to this Court's ready acquiescence in almost every prosecution request that a defendant be detained pending trial, many spectators therefore have no meaningful choice but to stand around the courthouse corridors and wait.

---

3. Although the attorney conference room located on the fourth floor of the courthouse is sometimes available, often it is already in use by other counsel for meetings, telephone calls or as a space in which to work quietly.

10. In Subparagraph B.1., the affiant also made reference to HAMC members and prospects *"conspicuously displaying HAMC insignias"* in the hallways. Utilization of the term "conspicuously displaying" appears intended to convey the notion that wearing such clothing is improper or inappropriate—some kind of affirmative, aggressive action.

11. That implication is a substantial distortion of the fact that HAMC members and prospects have merely appeared at the courthouse for hearings which did not involve jurors, wearing their normal garb, including jackets, jewelry, belts and T–Shirts which bear the HAMC name or insignias. Their right to wear these items is protected generally by the First Amendment to the United States Constitution.

12. Prior to such hearings, Judge Stahl had not issued any order to proscribe the wearing of these items, and I have no doubt whatsoever that if the Court had deemed those actions to be in any way inappropriate, he would have taken immediate steps to remedy the situation. Perhaps Judge Stahl chose not to do so because such items were not "displayed" in the manner of waving signs and placards. The "displays" observed by the affiant were no more than passive acts of wearing items of clothing or jewelry, none of which had been manufactured or prepared specifically for use within the courthouse. They were and are normally worn by HAMC members and prospects as they go about their daily lives.

13. I believe that this "display" would only have been perceived as "conspicuous" by a person who was not used to seeing HAMC members and prospects in close quarters. Admittedly these items are conspicuous in the sense that HAMC members are not regular courthouse visitors; however their actions were no more "conspicuous" in a negative sense than if the courthouse corridors in Concord, New Hampshire were filled with Native Americans who chose to wear tribal garb when they appeared at hearings on a case that they deemed significant.

14. Finally, in Subparagraph B.1 the affiant also made reference to the fact that co-defendants David Beaton and George Caruso had appeared at a hearing before Judge Stahl and testified "wearing full HAMC 'colors'." The inclusion of this observation was obviously based upon the affiant's belief and perception that their doing so was in some manner "insubordinate", "disrespectful", or otherwise "wrong" or "inappropriate".

15. Admittedly, if I were their attorney I might have suggested, as a matter of courtroom "tactics" that they not do so, and that instead they wear some form of "court clothes", although not necessarily a suit and tie. On the other hand, clients have sometimes convincingly insisted to me that they would prefer to wear certain garb because it made them feel more comfortable in wholly unfamiliar surroundings and/or uncomfortable situations.

16. I would again suggest, however, that if Judge Stahl were in any way offended by their clothing, or felt that it was in any way an attempt to intimidate the Court or otherwise improperly affect the judicial process, he would have taken swift remedial action. He elected not to do so. Therefore I believe that the terminology utilized in the Garrigan Affidavit merely reflects the affiant's personal prejudices, and should not affect this Court's conclusion about the need for an anonymous jury herein.

B. In Subparagraph B.2 of the Garrigan Affidavit, the affiant made reference to having been "advised" by a Deputy U.S. Marshal that after directing an HAMC prospect, who had "attended many of the public court proceedings in this case", to move to other seats in the spectator section of the courtroom, the deputy Marshal overheard the prospect state that "They're going to have to have an auditorium when this thing goes to trial." The affiant did not specifically claim that such comment was inappropriate or threatening, assuming *arguendo*, that it was accurately reported. Therefore, taken at face value, it appears to be no more than a hyperbolic statement that at trial existing seating problems would be exacerbated by the fact it was likely that even more of the defendants' friends and family members would choose to be present.

C. In Subparagraph B.3 of the Garrigan Affidavit, the affiant claimed that a New Hampshire State Police "intelligence officer" had reported that T-shirts with insignia supportive of HAMC defendants Charles Pasciuti and Charles Cassella, as well as other defendants in this prosecution were being distributed and sold. This Subparagraph was also phrased to suggest that these "reported activities" were in some way "wrong" or "sinister". Assuming, *arguendo*, that the described activity did occur, I ask the Court to consider:

  1. All of the reported activity seems perfectly legal, and is certainly protected by the First Amendment to the United States Constitution. The affiant certainly did not explicitly suggest otherwise.

  2. Surprising though it may be to the New Hampshire State Police and to the affiant, there are people who do not necessarily believe that simply because a person has been indicted, or is an HAMC member, or both, he is guilty of the charged offense(s).

3. Equally surprising to prosecutors and law enforcement personnel may be the fact that most defendants, including those in the case at bar, do not have the luxury of the virtually unlimited budgets enjoyed by federal prosecutorial agencies to prepare and try criminal cases. They generally need to raise money on an *ad hoc*, grass roots basis. It is again significant that neither the state policeman nor the affiant explicitly asserted that there was anything inherently untoward, improper or unlawful in the described activity.[4]

D. In Subparagraph B.4 the affiant referred to "intelligence" information that the HAMC and the Devils (sic) Disciples Motorcycle Club ("DDMC") are "at war", and that two HAMC members were stabbed by DDMC members in November 1991 in Revere, Massachusetts. It was further asserted that the "conflict ... is longstanding ... [with] roots in the murder of an HAMC member in New Hampshire ... [in] 1972." It was also reported that the HAMC has also "been in conflict with the Outlaws Motorcycle Club" ("OMC") since the mid–1970s, when two HAMC members were murdered in Florida by members of the OMC. Again assuming, *arguendo*, the accuracy of such information, I would note that:

  1. The affiant didn't state the relevance of these reports to the circumstances of the instant case or to purported need for empaneling an anonymous jury.

  2. It is my understanding, gained from conversations with attorneys who have consulted with me in regard to those events, that the HAMC members who were reportedly stabbed by members of the DDMC belonged to the Salem, Massachusetts HAMC chapter, rather than the Lowell Chapter to which many of the defendants in the instant prosecution are attached.

---

**4.** This callous disregard for the economic disadvantage of persons accused of crimes in federal court is manifested in the fact that funds for attorneys appointed pursuant to the Criminal Justice Act were allowed to run out in June of this year, and will not again become available until October.

3. Assuming, *arguendo*, that such reports have any degree of accuracy, the "longstanding conflict" between the HAMC and DDMC hardly seems to have much substance, apparently being comprised of only two incidents which were spaced more than 20 years apart.

4. The reports about another HAMC "war" with the OMC, which group has no chapters in the New England states, appears as irrelevant to the issues and circumstances of the prosecution's request to empanel an anonymous jury in this case as is the purported conflict between the HAMC and the DDMC.

E. In Subparagraph B.5 of the Garrigan Affidavit, the affiant recounted information purportedly provided to a New Hampshire State Trooper by one William Madeiros, a former member of the New York City chapter of the HAMC. Madeiros reportedly stated that he "had known" my client, Charles Pasciuti, and that Mr. Charles Pasciuti would "make a concerted effort to identify all potential witnesses", that the Lowell Chapter was notorious for going after government witnesses, and described various steps that he believed would be taken in that regard. I have personal knowledge of Mr. Madeiros and the accuracy of his purported statements, as follows:

1. In 1985, I was counsel for Howard Weisbrod, an Oakland, California HAMC member, who had previously been a member of the New York City HAMC chapter with Madeiros. Mr. Weisbrod had been charged in the same indictment in the United States District Court for the Southern District of New York as was Mr. Madeiros, all as part of a nation-wide FBI investigation denominated "Operation Roughrider".

2. As stated in the Garrigan Affidavit, Madeiros was a fugitive from justice, and when finally apprehended in October, 1985, he decided to "cooperate" with the government in return for an assortment of favors. I have had opportunities over the years since his apprehension to review various FBI reports of statements given by Madeiros during various debriefings.

3. Madeiros's claim to have been acquainted with Mr. Charles Pasciuti "for many years", while *technically* correct, is at the same time *highly* misleading. Mr. Pasciuti has been an HAMC member since July, 1971. Madeiros claimed to have been a member since December, 1969. Thus there exists a *theoretical*, twenty year "window of opportunity" during which Madeiros could have had some contact with Mr. Charles Pasciuti and with the Lowell HAMC Chapter.

4. However on November 20, 1985, in an interview with FBI Agents Jay E. Colvin and Richard G. Martinez, "MADEIROS explained that in 1971, he went to jail for possession of firearms and sexual abuse. He remained in jail until August, 1979 when he was released and rejoin (sic) the HAMC–New York City Chapter." His convictions were for stolen property and weapons possession, First Degree Rape, First Degree Sodomy, First Degree Sexual Abuse, Confinement, and Possession of a Weapon, and he received concurrent sentences, the longest of which was 108 months.[5]

5. The incarceration of Madeiros, which began approximately one month *before* Mr. Charles Pasciuti became an HAMC member in July, 1971, caused the *theoretical* window of opportunity for contact between them to shrink from twenty (20) years down to twelve (12).

---

**5.** A copy of the relevant page from an FBI Report dated November 20, 1985, has been attached hereto as "Exhibit A".

6. That *theoretical* window of opportunity for contact between them was again narrowed from twelve down to five (5) years, because Madeiros had terminated his relationship with the HAMC when he surrendered to federal authorities and became cooperating witness in October, 1985.

7. The remaining *theoretical* window of opportunity for contact between now stretches only from August, 1979, when Madeiros was released from prison, until October, 1985, when he surrendered to the FBI as a result of the "Roughrider" prosecution. However Mr. Pasciuti had been incarcerated within the Massachusetts prison system from November, 1980 until January, 1988.

8. Therefore, over the past *20 years,* the notoriously unreliable Madeiros could only have had a *mere possibility* of contact with Mr. Charles Pasciuti over a period of approximately 15 months between August, 1979 and November, 1980.

9. I also have personal knowledge that Mr. Charles Pasciuti and one other Lowell HAMC member, who has not been charged or named in this indictment, are the only two *current* Lowell HAMC members who were also members in 1985. Therefore his "knowledge" of the "reputation" of the HAMC's Lowell Chapter could only have been minimal at best, and in practical terms can best be described as nothing more than "ancient history".

10. AUSA Garrigan provided no *specific* supporting information as to the basis for the broad generalities about the Lowell HAMC Chapter which he attributed to Madeiros. For obvious reasons he could have had no personal contact with Mr. Charles Pasciuti for the past twelve (12) years. Therefore no credence should be given to the third-hand information attributed to Madeiros in Subparagraph B.5 of the Garrigan Affidavit.

F. In Subparagraph B.6 of the Garrigan Affidavit, the affiant included hearsay information provided by a patrolman from the Westford, Massachusetts Police Department. Mr. Charles Pasciuti reportedly confirmed his position as an HAMC officer, and supposedly stated that the "war" with the OMC had started when two HAMC members were killed in Florida. The affiant stated nothing about the relevance of such information to the prosecution's request to empanel an anonymous jury, most likely because there is no such relevance.

IX. Subsection C of the Garrigan Affidavit is entitled "Interference With the Judicial Process in Other Cases Involving Members or Associates of the HAMC". I have knowledge of the background and circumstances of many of these allegations. That knowledge has been gained through the representation of HAMC defendants in cases beginning in the mid–1970s in Massachusetts, and in other cases since that time in the state and federal courts of New Hampshire, Vermont, Connecticut, New York, New Jersey, Ohio, Nebraska, Missouri, and California.

X. The allegations in the Garrigan Affidavit were supported by pleadings which had been filed in other HAMC-related cases. These were attached to the Garrigan Affidavit as "Exhibits A–E", inclusive. Most of the matters recounted therein related to non-existent events, to situations which were inaccurately described, or which were so remote from the instant proceedings as to be wholly irrelevant to issue of empaneling an anonymous jury herein, as follows:

A. In Subparagraph C.1 of the Garrigan Affidavit, the affiant identified the case of *United States v. Paul Casey and Brendan Manning,* which was tried in the United States District Court for the Southern District of New York in 1987. I have personal knowledge of that jury trial before the Honorable Pierre Leval in 1987, because I assisted Mr. Manning's attorney, William Mogulescu, Esquire,[6] in the

---

6. Mr. Mogulescu is now a judge in the criminal courts of Manhattan.

selection of jurors. Co-defendant Casey had entered a guilty plea before the trial commenced. My memory of those events is that although the government may have moved for an anonymous jury, Judge Leval did not grant that request. I believe that we were given the jurors names and their counties of residence, and some demographic information about the neighborhood in which each prospective juror lived.

B. I have knowledge of many of the matters referred to in the 1987 affidavit of AUSA McGuire, which was attached as "Exhibit A" to the Garrigan Affidavit, as follows:

1. Reports which I had reviewed demonstrated that the San Diego "rape" as described in Paragraph 2 simply never occurred. The complaining witness was not intimidated; she later admitted that her whole story had been a fabrication and cover for her own inappropriate behavior with persons other than the HAMC members who had been charged.

2. I have never heard of the events described in Paragraphs 3 and 4. I believe, however, that little credence should be given to such allegations, because the HAMC members who purportedly committed the described acts were not identified by AUSA McGuire, nor, apparently, was anyone charged with a criminal offense in relation thereto.

3. I am very familiar with the allegations in Paragraph 5 and 8 of AUSA McGuire's affidavit, because they were the subject of overt acts charged in furtherance of the RICO conspiracy contained in a 1979 indictment in the Northern District of California. I defended Oakland, California HAMC member Albert Lee Perryman in that case. I personally cross-examined all of the technical experts and percipient witnesses who testified on behalf of the prosecution in regard to those bombings, in an effort to demonstrate that the government's theories about HAMC involvement were not born out by the physical evidence. Also, the victims admitted that there had been many non-HAMC persons whom they had arrested who had directly threatened them. They also admitted their belief that such persons were certainly capable of inflicting the threatened harm. After the trial concluded, I spoke with several jurors who informed me that although they had been hung 9–3 for acquittal on the charges generally, they had unanimously agreed that the accused HAMC defendants had not been guilty of the Kracht and Zerby bombings.

4. I will address the "Margo Compton" matter, described in Paragraph 6 of AUSA McGuire's affidavit in some detail, *infra*.

5. I have not previously heard the allegations contained in Paragraphs 7 and 9 of AUSA McGuire's affidavit describing events which purportedly occurred in San Diego, California in 1977 and 1978. As with many of these HAMC fantasy tales, it is significant that Mr. McGuire never stated who provided the information contained in that paragraph, when it was provided, and why there is any basis for this Court to believe it to be accurate. There was no suggestion that anyone was ever even charged with a state or federal offense for these acts. For these reasons, it should be given no credence or weight whatsoever.

6. I also am unacquainted with the allegations about the 1982 events in San Diego, California described in Paragraph 10 of AUSA McGuire's affidavit. Although the affiant claimed that there was a prosecution in that matter, the lack of attribution to any source of the information, or any case number, as well as the remoteness in time (10 years ago), place (3000 miles distant), and unrelatedness of persons involved to this prosecution, strongly suggest that these allegations have no relevance to the issue of an anonymous jury in *this* prosecution.

7. In Paragraph 11 of AUSA McGuire's affidavit, it is alleged that after the search of the Akron, Ohio HAMC clubhouse in 1982, the Akron HAMC Chapter attempted to hire someone to kill an Akron Police Captain. In regard to this allegation, I would advise the Court:

a) I was involved as defense counsel in the only prosecution which arose from that search, and I am thoroughly familiar with the circumstances surrounding it, as well as facts its aftermath. I had never heard of this "murder plot" before reading AUSA McGuire's affidavit, and consider the allegation to be ludicrous.

b) The state search warrant had authorized the seizure of evidence of misdemeanor violations of the Akron City Code; that is, running an after-hours liquor establishment.

c) Two Akron HAMC members were charged federally with firearms violations, based upon seizures during that search. They were both granted pretrial release, and no attempt was made to block it or revoke it, based upon that rumor or for any other reason. Defendant David Beal's charge of possessing an unregistered firearm, a "pen gun" capable of firing a single 22 caliber bullet, was dismissed after his motion to suppress evidence was granted by Judge Krenzler of the United States District Court for the Northern district of Ohio. Suppression of that evidence was later affirmed by the United States Court of Appeals for the Sixth Circuit.

d) Co-defendant James Caronite, whom I represented, was charged with being a felon in possession of a firearm. After a trial before Judge Krenzler and jury, Mr. Caronite was acquitted after 35 minutes of jury deliberations. No mention had ever been made at any time before or after that prosecution about an attempt to hire someone to kill an Akron police officer. I note that AUSA McGuire failed to attribute this preposterous story to any source, and for good reason.

8. Paragraph 12 of AUSA McGuire's affidavit makes reference to Toledo, Ohio murder trial of former HAMC member Jack Gentry in "October, 1982".[7] I have personal knowledge of those events because I was Mr. Gentry's lead counsel in that case, and am aware of the fact that AUSA McGuire's description of that situation is both incomplete, inaccurate, and therefore wholly misleading. Among the relevant facts which should be considered are the following:

a) The murder victim was a member of the Toledo, Ohio Chapter of the Outlaws Motorcycle Club ("OMC").

b) Numerous members of the Toledo, Ohio OMC chapter were present at the courthouse daily, and throughout the trial were following HAMC members, as well as members of the defense team, in a hostile manner.

c) The "threat" was made to a prospective juror's son in a bar which was known to be an OMC "hangout". Under the extant circumstances, which were not challenged by the state prosecutors, there is no way that any HAMC member would have gone to that establishment at that time, or would have had any idea about the relationship between the juror's son and the juror. It was shown that OMC members clearly would have been in possession of such information.

d) AUSA McGuire's version of what was said to the juror's son was incorrect. The juror reported that her son had been told something to the effect that his mother had better reach a proper or correct decision.

---

7. The trial actually began in September, 1982.

He was *NOT* told that she should *acquit* Mr. Gentry. That fact becomes significant because from the *OMC perspective*, a "proper" result would have been to find my client, Mr. Gentry, guilty.[8]

e) After a hearing, the trial judge had no sense that this threat had emanated from the HAMC, and no limitations or sanctions were imposed upon the defendant or upon those who came to view the trial in his support.

f) The jurors returned a verdict of "not guilty" after approximately 8 hours of deliberations. Thereafter, no suggestion was made by law enforcement personnel or prosecutors that such verdict was the result of coercion or threats of any kind.

9. The allegation in Paragraph 13 of AUSA McGuire's affidavit about a "contract" to kill an ATF agent, involved another situation with which I am familiar. Special Agent Bernie Butkovich was the case agent in the *Gentry* and *Wortman* cases, as well as others in Ohio state and federal courts, all arising out of the testimony of a former Cleveland HAMC member, Clarence Addie "Butch" Crouch. There was no investigation nor were any charges preferred as a result of this purported "informant" information, and should be given no credence whatsoever by this Court.

10. The allegation about the use of anonymous juries in other HAMC cases, contained in Paragraph 15 of AUSA McGuire's affidavit may be accurate as to the use of an anonymous jury in the 1986 case in the Northern District of New York. I have no personal knowledge about the details of that trial. On the oth-

er hand, I believe that Mr. McGuire's statement that "a number of [other] Hells Angels trials have been conducted with anonymous juries" was wholly fallacious. I am not aware of any other HAMC trial being conducted with an anonymous jury prior to September, 1987, the date that the McGuire Affidavit was submitted.

C. In Subparagraph C.1 of the Garrigan Affidavit, at Page 11, and in Footnote 2 on that page, the affiant referred to the recent indictment of an HAMC member for the 1977 murder of Margo Compton and her children. I first heard about these allegations in the summer of 1979, when I defended Mr. Perryman in *United States v. Barger, et al.*, in the United States District Court for the Northern District of California. My role in that case was referred to *supra* in regard to the Kracht and Zerby bombings. Thirty-three (33) defendants, including HAMC members and persons allegedly associated with them, had been indicted. Eighteen (18) of them actually went to trial.[9]

D. What has been omitted from the prosecution's versions of the Margo Compton matter was that she was allegedly *also* going to testify against two San Francisco police officers. The HAMC member was facing a mere misdemeanor conviction for which the maximum sentence would have been 18 *months* of incarceration. The San Francisco police officers were facing not only felony criminal charges, but loss of their jobs and disgrace. Thus there was a minimal motive for any such extreme action on the part of the HAMC member, but a substantial greater incentive on the part of others. It should again be noted that even if true, these events would be so wholly remote in time, location, and

---

8. It should be noted that neither the judge nor the prosecution sought to have the son testify about the incident.

9. The trial began in September, 1979, and concluded in July, 1980. An anonymous jury was not requested, nor were there any allegations of improprieties in defendants conduct toward the jury, which eventually was hung 9–3 for acquit-

tal. During the six month retrial involving 12 defendants, in which I again represented Mr. Perryman, the jury was again hung 9–3 for acquittal, after which all charges were dismissed. The prosecution again made no allegations of misconduct by defendants toward those jurors.

individuals involved as to have no bearing whatsoever upon the instant prosecution, or upon the need for an anonymous jury herein.

E. In Subparagraph C.1(a) of the Garrigan Affidavit, the affiant related information which he had received from Detective Barone of the Connecticut State Police who claimed that he had:

"received reliable information that he and Chief Assistant United States Attorney for the District of Connecticut, H. James Pickerstein, were to be physically harmed by the HAMC. As a result, Barone was subject to intense round-the-clock security for an extended period of time." Garrigan Affidavit, P. 11–12.

AUSA Garrigan further reported that "[t]hese attempts at violence were to be funded by the HAMC Oakland, California Chapter", and that the alleged "threats" were purportedly related to Barone and Pickerstein's involvement in an investigation and prosecution of HAMC members in Connecticut and elsewhere in 1985–1986, code-named "Operation Roughrider". As stated above, I have personal knowledge of the circumstances of that investigation and related prosecutions, as follows:

1) I represented a number of defendants who were charged as a result of that investigation, including:

a) HAMC member Roger Mariani, in the United States District Court for the District of Connecticut;

b) HAMC member Glenn Main, in the United States District Court for the District of Massachusetts;

c) HAMC member Howard Weisbrod, in the United States District Courts for the Southern District of New York and Northern District of California.

2) As a part of my representation of Mr. Mariani, I met and conversed with Mr. Pickerstein on many occasions, and also prepared for trial in the District of Connecticut. After a

mistrial had been declared during the initial jury selection in part because I could not be present, Mr. Mariani eventually pled guilty.

3) Through my representation of "Roughrider" defendants Weisbrod, Mariani and Main, I became thoroughly familiar with allegations in regard to the HAMC during and resulting from those prosecutions.

4) Initially, it should be noted that Detective Barone's testimony at the detention hearings in the *Pasciuti* was not as represented in the Garrigan Affidavit. In *Pasciuti*, Barone testified:

"It was a word through a source within [the federal Metropolitan Detention Center] in New York City that there was a threat made against the life of three officers and an assistant U.S. Attorney in that investigation.... [T]hese individuals were afforded protection and constant surveillance by the federal authorities ... [for] about six months beyond [the pretrial period]." *Transcript, October 15, 1991, P. 121–122.*

5) In the Garrigan Affidavit, the affiant intimated that these alleged threats had specifically been directed against Barone and Pickerstein, and that it had occurred in *Connecticut;* whereas according to Barone's testimony in this case, they were purportedly directed against three (3) unnamed "officers" and an "assistant U.S. Attorney", and emanated from the federal detention facility in *New York City.*

6) It is my belief that the source of such information was certainly not considered *"reliable"* by law enforcement. Indeed, in his testimony at the detention hearing in this case, Detective Barone did not assert that the information he related had come from a *"reliable"* source. He only attributed it to "a source". This is not a mere matter of "semantics". The experienced law enforcement officers and prosecutors who represent the government in this case are well aware that to identify a source as

"reliable" is, in effect, a statement based upon experience and upon knowledge of all of the circumstances of a situation that there is a factual basis for that conclusion, such as past information which has been proven reliable, or independent corroboration from other events and/or sources.

7) There are additional reasons why the information in the Garrigan Affidavit as to the "death threats" to Barone and Pickerstein should be given no credence by this Court, as follows:

a) On Thursday, July 2, 1992, I spoke with former AUSA Pickerstein about these alleged threats and the "intense round-the-clock security" described in the Garrigan Affidavit. He told me that he was unaware of any death threats directed toward him or Trooper Barone as a result of the "Roughrider" investigation and prosecution.[10]

b) No request was made for the empaneling of an anonymous jury in the Mariani prosecution in the District of Connecticut by AUSA Pickerstein, and no reference was made during proceedings in that case in regard to that purported threat.

c) In the *Brendan Manning* prosecution, and in the affidavit of AUSA McGuire, which were identified in Subparagraph C.1 of the Garrigan Affidavit, there was absolutely no mention of the threats described by Detective Barone and by AUSA Garrigan. If any *reliable* source had reported the existence of any threats of that nature having been made, I suggest that AUSA McGuire would certainly have referred to it at some point in the affidavit which he submitted on September 18, 1987 in support of the government's request for an anonymous jury, some 28 months after the "Roughrider" indictments had been returned.

E. I have no knowledge of the circumstances of the case of *United States v. Blackwell, et al.*, which was the subject matter of the motion included in "Exhibit B" to the Garrigan Affidavit, or of the circumstances in *United States v. Barger, et al.*, in the Western District of Kentucky, which was discussed in the supporting affidavit of Charles Norman.

F. I likewise have no knowledge of the circumstances which surrounded a pamphlet purportedly mailed in the *Blackwell* case, which was the subject matter of the letter and attachment included in "Exhibit C" to the Garrigan Affidavit.

G. I have substantial knowledge of circumstances pertaining to *United States v. Wortman*, discussed in Subparagraph C.4 of the Garrigan Affidavit, at Page 13, and of the matters raised in the government's motion for an anonymous jury in that case, a copy of which was attached as "Exhibit D" to the Garrigan Affidavit. I was counsel for defendant Wortman, and participated in three (3) jury trials before it was finally resolved.[11] Judge Dowd was apparently sufficiently persuaded by the true facts which I presented in response to the government's memorandum, that he *denied* the government's motion for an anonymous jury. It is possible that AUSA Garrigan was not aware of that result.

---

10. He said that in 1982, three (3) years prior to the "Roughrider" charges, there was a threat made against him by an HAMC member whom he had successfully prosecuted on firearms charges; however regarded it as one which was personal to the person who made it, rather than as a "Hells Angels" threat. He stated that nothing ever came of it.

11. After the first trial of Mr. Wortman and co-defendant, Ray Ribich, the jury was hung 10–2 for conviction on all 23 counts (12 against Wortman and 11 against Ribich). The second trial resulted in Wortman's acquittal on 10 of the 12 counts against him, and Ribich's acquittal on all eleven counts. The jurors were hung 11–1 and 10–2 for Wortman's acquittal on the two remaining counts. He was convicted on one of these after a third trial, and the remaining count was then dismissed.

Alternatively, perhaps based upon his normal experience with rulings in this Court, he somehow assumed that virtually any prosecution motion would have routinely been granted.

H. I would make the following observations about the matters set forth in the government's memorandum submitted in support of its motion to empanel an anonymous jury in the Northern District of Ohio in *Wortman*, which was attached as Exhibit D to the Garrigan Affidavit:

1. I have discussed, *supra*, the falsity of allegations therein about the *Gentry* murder trial in Toledo.

2. It was further alleged that after the *Gentry* trial, "Each juror was contacted at home and invited to a luncheon given by the Hells Angels at the Sheraton–Westgate Hotel in Toledo." Exhibit D, Pages 2–3. The *true* facts are:

a) The jury's verdict was returned at approximately midnight. Immediately afterward, all Hells Angels who were in Toledo for the trial, and all members of the defense team drove to Cleveland.

b) No "luncheon" was ever given for the jurors in the *Gentry* trial at the Sheraton Westgate Hotel or elsewhere.

c) I am aware that at my request and expense, jury consultants Rebecca Lynn, and Cathy E. Bennett,[12] who had assisted me in the *Gentry* trial, returned to Toledo to conduct post-trial interviews with several of the jurors. Each of these was conducted on an individual basis at the Sheraton Westgate Hotel, at which Ms. Bennett and Ms. Lynn stayed while conducting such interviews.

d) Ms. Lynn recalled that one of the interviews was conducted at a restaurant at the Sheraton, and that she paid for a plate of "nachos" eaten by the juror.

e) Neither counsel nor HAMC members were present at any of these interviews.

f) On Thursday, July 16, 1992, I spoke by telephone with Ms. Lynn in regard to the *Gentry* trial and the post-trial interviews with jurors. She confirmed my memory of those events, and stated that she would be willing to give me an affidavit or to testify to those facts if they were questioned.

3) In the government's motion, it was also alleged that in the Fall of 1982, an Akron HAMC member was tried to a *non*-anonymous state court jury in Akron, at which "Hells Angels from various parts of the country were present, displaying their colors and maintaining a large presence in the courtroom." "Exhibit D", Page 3.

4) I have personal knowledge of that matter, as I attended two days of that trial as a spectator. No effort was made, nor were any actions taken to intimidate jurors, nor was any accusation in that regard made by the Summit County prosecutors. Perhaps the best indication of *non*-intimidation at that trial is the fact that those jurors found the HAMC member, and his co-defendant girl-friend guilty of all charges against them.

5) The government's motion further charged that in early 1983, in Cleveland, a trial occurred in which HAMC members appeared and "made it a point to constantly stare at the jurors." While the trial was not identified, I am personally aware of which trial was being referred to, because it was the only trial of an HAMC member which took place in Cleveland in January of 1983, and I

---

12. Ms. Bennett died approximately six weeks ago. She was perhaps the leading expert in the United States in matters relating to juries. Her last case was the trial of William Kennedy Smith in Palm Beach, Florida. Ms. Lynn remains very active in jury work, and among her recent cases was the trial of General Noriega in the United States District Court for the Southern District of Florida.

was counsel for the defendant, Andrew Shission, who had been charged in Cuyahoga Court of Common Pleas with "Aggravated Murder". The *true* facts are:

a) The trial was conducted before the Honorable Lloyd Brown, and jury. Judge Brown granted Mr. Shission a judgment of acquittal at the close of the State's case.

b) After the judgment of acquittal was entered, Judge Brown invited counsel, and a reporter for the Cleveland Plain Dealer to join him and all jurors in the jury room to discuss the case. The prosecutor declined to do so, but I was present with co-counsel, and with all of the jurors, alternates, the newspaper reporter, and Judge Brown.

c) The jurors told us that if the case had been submitted to them for a verdict at that time, they all (including alternates) would have voted for Mr. Shission's acquittal.

d) They further stated, in response to specific questions, that not only had they not been intimidated by the presence of HAMC members in the courtroom, but they regarded it as a positive statement of caring and concern toward Mr. Shission by his friends.

6) The final accusation in the government's motion was that at the trial of a Cleveland HAMC member in Akron, Ohio in October, 1983, during jury selection, "a suspicious car was observed driving up and down a street in Akron where two of the prospective jurors lived. The car contained two bearded individuals and was found to be registered to an Akron Hells Angel." Exhibit D, at Page 4.

7) I am also familiar with this situation because I represented that defendant, Andrew Shission, who had been charged with another aggravated murder in Akron, Ohio. The *true* facts of that allegation are as follows: [13]

a) As a defense attorney in HAMC cases before and after the Shission trial in Summit County, I have became aware that over the past 20 years there has been an overwhelming amount of highly negative, prejudicial publicity with respect to the HAMC in both the print and electronic media throughout the United States.

b) At Mr. Shission's Summit County trial, publicity was so pervasive that on the Monday when jury selection had been scheduled to begin, Judge Murphy, *sua sponte*, dismissed the entire "special" panel, each member of which had been *personally* summoned to appear by a deputy sheriff, in keeping with Ohio procedures for aggravated murder cases.

c) The immediate cause of that court's fair and proper exercise of its judicial discretion and supervisory powers was the publication in the Sunday edition of the Akron Beacon–Journal, "above-the-fold" on the front page of the local news section, of an extensive article in regard to Mr. Shission and his trial which was to begin the following day.

d) The text of the Beacon–Journal article was published alongside of an large aerial photograph of Mr. Shission's residence. The article contained numerous statements by law enforcement personnel as to their belief in Mr. Shission's guilt, and details of the prosecution's theory of that case. It also included several

---

13. The facts about to be related were also presented by me in a Declaration in Opposition to the empaneling of an anonymous jury in the case of *United States v. Yee, et al.*, wherein the government also requested that an anonymous jury be empaneled. The government's motion in that regard was attached as "Exhibit E" to the Garrigan Affidavit in *Pasciuti*. AUSA Garrigan was again perhaps unaware of the fact that the government's request for an anonymous jury in *Yee* had been *denied*.

highly negative and inflammatory references to alleged past activities of other HAMC members, personal information about Mr. Shission, and other matters which could not have legitimately been introduced into evidence at trial because they were wholly unrelated to the charge pending against him.

e) One of the reasons for Judge Murphy's summoning of a new jury panel was his finding that the article had been knowingly published with the intention of impacting upon the jurors who were all aware that they had been summoned to hear that case. It had been carefully calculated to do so before they could be warned to avoid pretrial publicity.

f) Judge Murphy properly rejected the same type of heavy-handed prosecutorial attempt to improperly and unfairly influence prospective jurors before trial which this Court has so far been willing to countenance in *Pasciuti.*

g) After a new jury panel had been summoned, I took steps, together with jury consultant Cathy E. Bennett, to thoroughly prepare for voir dire examination of the prospective jurors in order to intelligently exercise peremptory challenges and those for cause.

h) Among the techniques which we decided to utilize for the Shission trial was to dispatch teams out into the field to develop profiles of the homes and neighborhoods where each of the prospective jurors resided. We knew that we could gain valuable insights from such background information about the location and outward appearance of their residences. This technique had the additional advantage of not being required to ask the prospective jurors to discuss such potentially embarrassing personal details of their lives in open court. It also served to objectively test the veracity of certain of the subjective responses which each would make to related questions propounded by the court and counsel.

i) We developed "check lists" of information to be completed in the field, including such matters as: the type of residence (single family or multiple); the appearance of the residence (well kept up, dilapidated, appearing more or less expensive than others nearby, etc.); a description of the neighborhood (by such factors as wealth, level of racial integration, prevalence of young children, etc.); and other clues as to the attitudes of the prospective juror (e.g. slogans on car bumper stickers, signs showing political affiliations, and participation in neighborhood law enforcement programs such as "crime stoppers" and "block watch").

j) The two person teams had been instructed to act as unobtrusively as possible when they made their field observations.

k) I have utilized these procedures in cases both before and after the *Shission* trial in Summit County, many of which did not involve HAMC defendants. In no instance was either the purpose or effect of such efforts to threaten or intimidate the prospective jurors. Indeed, I had always been greatly concerned, especially in "high profile" cases, that any such inappropriate behavior would cause a "backlash" and irreparable damage to the client's ability to empanel a fair jury in the case. I also knew that such actions would severely and negatively impact upon my personal credibility with courts and prosecutorial agencies, thereby adversely affecting my ability to provide a thorough and effective defense for other clients.

j) During the *Shission* Summit County case, we found out that one of our teams had been seen making its field observations. To the best of my memory, that sighting was re-

portedly not made by a prospective juror. It was made by a neighborhood resident who had written down the license plate and then had called the police because he was concerned about the "suspicious" behavior of two people in an older-model car who were driving slowly through the area, taking notes.

k) The matter was immediately brought to the attention of the court. Judge Murphy was satisfied that there had been no improper purpose in that activity, and that there was no reason to conduct any further inquiry into the matter.

l) The Shission jury was selected after a detailed, attorney-conducted voir dire, and the case was tried without any untoward incidents or inappropriate behavior. After the prosecution rested its case, Mr. Shission testified in his own defense, and was acquitted by that jury.

H. In Subparagraph C.5 of the Garrigan Affidavit, the affiant asserted:

"In *United States v. Steven Wayne Yee, et al.*, [Citation omitted], the Government filed a motion for an anonymous jury.... The Motion and supporting documents ... again reviewed the history of HAMC attempts to subvert justice in the State of Ohio and elsewhere."

A copy of the government's motion in *Yee* was attached as "Exhibit E" to the Garrigan Affidavit. *Yee* was a case against Cleveland HAMC members, brought in the Northern District of Ohio, Western Division, at Toledo.

I. As noted above, the government's motion to empanel an anonymous jury in *Yee* was *denied*. I have knowledge of this matter based upon the fact that defense counsel in *Yee* asked me if I would prepare a declaration in response to the government's pleading. A copy of the declaration which I filed in *Yee* has been attached hereto as "Exhibit B". Apparently *that* district judge refused to accept the unsupported and fallacious allegations in the government's pleading, and properly rejected the prosecution's extraordinary and unwarranted request to empanel an anonymous jury.

J. In Subparagraph C.6 of the Garrigan Affidavit, the affiant called this Court's attention to the testimony of Detective Barone at detention hearings in this case wherein he purportedly described "the Hells Angels penchant for violence and willingness to harm or intimidate anyone cooperating with law enforcement." I suggest that the Court has ample basis for disregarding this conclusory, hyperbolic, self-serving and inflammatory assertion, which has nothing whatsoever to do with *this specific* prosecution, or with the defendants charged herein.

K. The prosecution's reliance upon that statement by Detective Barone constitutes another attempt to foster an atmosphere of crisis and hysteria in regard to "security" which is wholly unjustified, unwarranted, and unnecessary. It is a tactic which the prosecution has repeatedly and successfully utilized, with this Court's unreasoned approval, to subvert defendants' rights to a fair and impartial trial.

L. In Subparagraph C.7 of the Garrigan Affidavit, the affiant made reference to the prosecution of Judge James McGettrick of the Cuyahoga County Ohio (Cleveland) Court of Common Pleas, purportedly for accepting bribes to fix cases of two HAMC members. Although that Judge was obviously taken-in by the agent's "sting" operation, no HAMC member was ever charged with *actually* having had his case fixed by Judge McGettrick. An ATF agent was simply able to capitalize upon an alcoholic, notoriously corrupt judge's greed by utilizing the HAMC name to "make" a case against him. *This* Court's consideration of *that* case should be limited to determining what *that judge's* crime has to do with *this* case.

L. The only HAMC member charged with bribery in regard to the activities of Judge McGettrick was my client, Andrew Shission. Mr. Shission had *never* appeared before him as a party in any type of case whatsoever. After the State rested its case at a trial in 1986, before the Honorable James J. Sweeney of the Cuyahoga Court of Common Pleas, Mr. Shission and his two co-defendants were granted judgments of acquittal as to all pending charges. Again AUSA Garrigan was apparently unaware of the true facts in regard to the McGettrick matter.

XI. Finally, I would ask this court to consider a short personal statement and opinion on my part. It is based upon many years experience in representing defendants who are members of groups or organizations which the government has denominated as "organized crime" in "high profile" criminal cases:

A. My clients have included alleged Mafioso, Hells Angels, and members of other groups which have been labeled by the United States Department of Justice as "organized crime". For example, I defended a man accused of being the leader of the Cosa Nostra in Cleveland, who was tried together with persons alleged to be the leaders of the Cosa Nostra in Chicago, Kansas City, Milwaukee and Las Vegas.[14] Of these, only in *Wortman* and *Manning* did the prosecution seek an anonymous jury,

and in those instances the requests were *denied*.

B. In no case in which I have appeared as counsel has any juror ever complained of harassment from any of the defendants, whether before, during or after the trial.

C. I am unaware of any reported First Circuit decision in which empanelment of an anonymous jury approved. I am also unaware of any case in this circuit in which it has been utilized, although I noted that in its July 13 order, this Court asserted that it has presided over trials in which an anonymous jury was utilized.

D. I suggest that this case simply does not require the extraordinary relief requested by the prosecutors herein. They have attempted, perhaps out of zealousness for their cause, to engender an atmosphere of fear and hysteria, without a substantial factual basis related to *these* defendants, and the events charged *in this indictment in the District of New Hampshire*. I respectfully ask the Court not to accede to their unwarranted request.

This declaration has been executed by me at San Francisco, California, on July 24, 1992.

_____

Alan P. Caplan

Attorney for Defendant

Charles T. Pasciuti

---

14. *United States v. Aiuppa, et al.,* in the United States District Court for the Western District of Missouri, at Kansas City. The trial began in September, 1985, and concluded in January, 1986 with all but two defendants found guilty.

## EXHIBIT A
## COPY OF RELEVANT PAGE FROM STATEMENT OF WILLIAM MADEIROS

*DUPLICATE*                    $GX-3520-G$

FD-302(rev.3-10-82)

FEDERAL BUREAU OF INVESTIGATION

Date of transcription
11/26/85

WILLIAM JOSEPH MEDIEROS, was advised of the identity of
the interviewing agents and the nature of the interview. Present
during the interview was SA THEODORE C. BALTAS, II, Alcohol,
Tobacco and Firearms (ATF) and LOUIS G. BARBARIA, New York State
Police Investigative Division.

MEDIEROS advised that he has been a member of the Hells
Angels Motorcycle Club (HAMC) since December 5, 1969. Prior to
that time he was a member of the Alien Nomad Club of New York and
the entire club prospected the HAMC (the process of applying to
join the HAMC in which the prospecting individual or club is
assessed by the full members of the HAMC before allowing them to
join). In 1969 they were granted a charter membership with
fifteen members and no opposition. MEDIEROS advised that he has
known SANDY ALEXANDER, member and president of HAMC-New York City
Chapter since 1967. MEDIEROS explained that in 1971, he went to
jail for possession of firearms and sexual abuse. He remained in
jail until August 1979 when he was released and rejoin the
HAMC-New York City Chapter. At one point MEDIEROS was the
Sergeant-At-Arms and President for HAMC-New York City and in May
1985 was the Security Officer of the New York Chapter.

MEDIEROS provided the following information regarding
ALBERT LEE PERRYMAN, also known as (aka) "BIG AL", member
HAMC-Oakland Chapter, Oakland, California:

MEDIEROS has known PERRYMAN since 1969 and describes
PERRYMAN as the "epitome of a cranker" (crank is a street term for
methamphetamine) on the west coast. MEDIEROS stated that in
regard to PERRYMAN "any party he was at there was always crank".
He stated that while at one of these parties "if you want a snort,
you go to AL". According to MEDIEROS in 1969 or 1970, JAMES NEAL,
aka "FUZZY" current member of HAMC, Oakland, California was a
member of the New York City Chapter and a

---

Investigation on 11/20/85 at Newburgh, New York        File # NY 12B-663
                                                               SF183B-1260

By SAS JAY E. COLVIN/RICHARD G. MARTINEZ         Date Dictated 11/21/85
   JEC/asw/ljv/cls

This document contains neither recommendations nor conclusions of the FBI.
It is the property of the FBI and is loaned to your agency; it and its
contents are not to be distributed outside your agency.

## EXHIBIT B

COPY OF DECLARATION SUBMITTED BY ATTORNEY ALAN P. CAPLAN IN *UNITED STATES v. YEE*

In the United States District Court For the Northern District of Ohio

United States of America, Plaintiff,

vs.

Stephen Yee, et al., Defendants.

Case No: 3; 89–CR–0720

JUDGE JOHN W. POTTER

MAGISTRATE JAMES C. CARR

## DECLARATION OF ATTORNEY ALAN P. CAPLAN

I, Alan P. Caplan, hereby state under the pains and penalties of perjury, as follows:

1. I am an Attorney at Law, and maintain my office at 630 Carolina Street, San Francisco, California, (415) 826–2371.

2. I am a member of the bar of the Commonwealth of Massachusetts, of United States District Courts for the Districts of Massachusetts, Northern District of Ohio and Northern District of California, and of the United States Courts of Appeals for the First, Second, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits.

3. I have been permitted to appear *"pro hac vice"* in the United States District Courts for the Districts of Vermont, Connecticut, Eastern District of New York, Southern District of New York, Middle District of Florida (Orlando Division), South Dakota, Nebraska, Northern District of Iowa, Eastern District of Missouri, Western District of Missouri (Northern Division), Western District of Missouri (Southern Division), Eastern District of Kansas, Northern District of Texas, Colorado, Eastern District of California, and Southern District of California.

4. I have been permitted to appear *"pro hac vice"* in the State Courts of New Hampshire, Maine, Rhode Island, Connecticut, New Jersey, Ohio, Nebraska, Iowa, California, and Washington.

5. Among the Ohio cases in which I appeared as counsel, *pro hac vice,* was as counsel for defendant Andrew Shission in the case of *State of Ohio v. Andrew Shission,* an aggravated murder prosecution in the Summit County Court of Common Pleas.

6. Mr. Shission was a member of the Cleveland, Ohio Chapter of the Hells Angels Motorcycle Club ("HAMC"), at the time of his indictment and trial.

7. I had previously served as defense counsel for several HAMC members in state and federal courts throughout the United States, including an earlier prosecution wherein Mr. Shission was tried and acquitted of aggravated murder in the Cuyahoga Court of Common Pleas, and one in which a Cleveland HAMC member, Jack Gentry, had been tried and acquitted of aggravated murder in November, 1982 in the Court of Common Pleas in Toledo.

8. As a defense attorney in related HAMC cases before and after the Shission trial in Summit County, I have become personally aware that over the past 20 years there has been an overwhelming amount of highly negative, prejudicial publicity with respect to the HAMC in both the print and electronic media throughout the United States. The most recent of these experiences occurred during a 3½ month trial in the United States District Court for the Northern District of California, *United States v. Alfred J. Abono, Jr., et al.,* which ended approximately two weeks ago.

9. At Mr. Shission's Summit County trial, publicity was so pervasive that on the Monday when jury selection had been scheduled to begin, Judge Murphy dismissed the entire "special" panel, each member of which had been personally summoned to appear by a deputy sheriff, in keeping with Ohio procedures for aggravated murder cases.

10. The immediate cause of the court's action was the publication in the Akron Beacon–Journal of an extensive article in its Sunday edition, which included statements of law enforcement personnel as to Mr. Shission's guilt, details of the prosecution's theory of the case, several highly

inflammatory references to alleged past activities of HAMC members, personal information about Mr. Shission's wealth, and other matters which were wholly unrelated to the charges at issue.

11. After a new panel had been summoned, I took steps, together with Ms. Cathy Bennett, an expert and leading consultant in the field of jury selection, to thoroughly prepare for voir dire examination of the prospective jurors and for the intelligent exercise of "cause" and peremptory challenges.

12. I had worked with Ms. Bennett in the past, and among the techniques which we decided to utilize for the Shission trial was to dispatch teams out into the field to develop profiles of the homes and neighborhoods where each of the prospective jurors resided. We knew that we would gain valuable insights from such background information about the location and outward appearance of their residences. This technique had the additional advantage of not requiring the prospective jurors to relate such potentially embarrassing personal details of their lives in open court. It also served to objectively test the veracity of certain of the subjective responses which each would make to related questions propounded by the court and counsel.[1]

13. We developed "check lists" of information to be completed in the field, including such matters as: the type of residence (single family or multiple); the appearance of the residence (well kept up, dilapidated, appearing more or less expensive than others nearby, etc.); a description of the neighborhood (by such factors as wealth, level of racial integration, prevalence of young children, etc.); and individual factors which might give us some clue as to the attitudes of the prospective juror (e.g. slogans on car bumper stickers, political signs on the property, signs indicating participation in law enforcement neighborhood activities such as "crime watch").

14. The two person teams were asked to go out into the field to make their observations as unobtrusively as possible.

15. I have utilized these procedures in many cases before and after the *Shission* trial in Summit County. Regardless of whether there were HAMC members involved, I am not aware of any instance in which the purpose or effect of such efforts was to in any way threaten or intimidate the prospective jurors. Indeed, I have always been greatly concerned, especially in such "high profile" cases, that any such inappropriate behavior would cause irreparable damage to the client's ability to empanel a fair jury in that case, and would substantially impair the ability of any other member of his group to do so in future cases. I also knew that such actions would severely and negatively impact upon my personal credibility with courts and prosecutorial agencies, thereby adversely affecting my ability to provide a thorough defense for other clients.

16. During the *Shission* Summit County case, we found out that one of our teams had been seen making its field observations. To the best of my memory, that sighting was not made by a prospective juror, but by someone in his/her neighborhood who was concerned about the "suspicious" behavior of persons driving slowly through the area, taking notes. The matter was brought to the attention of the court, and Judge Murphy was satisfied that there had been no improper purpose in that activity.

17. The Shission jury was selected after a detailed voir dire, and the case was tried without any untoward incidents or inappropriate behavior. After the prosecution rested its case, Mr. Shission testified in his own defense, and was acquitted.

18. From time to time, in other cases in which I appeared as defense attorney for an HAMC member in federal court in Ohio, the prosecution had raised the matter in an effort to limit voir dire of prospective jurors or even to obtain an "anonymous

---

1. While the techniques and incidents described herein relate to the HAMC, I have applied the same principles, with the same results, in other "high profile" cases on behalf of clients who allegedly belonged to groups classified as "organized crime".

jury". In each instance, after inquiry and explanation, that request was *rejected* by the court. Among the cases in which I believe this happened was the 1983 prosecution of two HAMC members, Carl Wortman and Raymond Ribich in the United States District Court for the Northern District of Ohio, before the Honorable David D. Dowd, Jr. and jury.

19. The following summary from my experiences in selecting jurors for criminal trials of HAMC members over the past 15 years, in cases from Vermont to Nebraska, and from Ohio to California, may hopefully prove to be of some assistance to the court in this case:

a) I have interviewed not less than 3500 prospective jurors in such cases, and no more than 10 of them had never heard of the Hells Angels Motorcycle Club. Of these, most were foreign-born and recently naturalized United States citizens.

b) Virtually without exception, most of them had learned of the HAMC through the media, and a very few from some personal experience or acquaintance.

c) Also virtually without exception, most of that information about the HAMC was very negative and highly prejudicial, although after review, it generally proved to be inaccurate or misleading.

d) I have found that such prospective jurors often find it difficult to repeat something negative about the HAMC and its members, which he/she had either read, heard, seen, or may actually believe, out of concern for not being *publicly* (in open court) perceived as impolite or prejudiced.

e) For this reason, with respect to issues related to a defendant's HAMC membership, the use of a questionnaire and directing follow-up questions to each of them outside of the presence of other jurors has the twofold benefit of creating an atmosphere in which each juror will be most comfortable and therefore most likely to answer questions candidly, and also of ensuring that the remainder of the panel does not become polluted because of negative responses from any one of them.

f) Admittedly this procedure initially appears somewhat time-consuming; however it usually proves to be more economical in the long-run, because it minimizes the possibility that a mistrial will later be required as the result of jurors becoming infected during the course of trial by previously overlooked or unexpressed prejudice on the part of other jurors.

20. In all of the many cases in which I have appeared as counsel on behalf of an HAMC member, I am not aware of a single instance of inappropriate behavior toward any juror, prospective or seated, by any Hells Angel or by any person associated with an Hells Angel member. It has been my experience that a Hells Angel, as much as anyone in our society, is truly aware of the fact that our jury system, fairly administered, is a bastion of strength and beacon of hope against prejudice and prosecutorial overreaching, and represents his clearest opportunity for an honest resolution of the issues set for trial.

This declaration has been executed at San Francisco, California, this 9th day of October, 1990.

Alan P. Caplan